**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1710**

WHITE COAT WASTE PROJECT,

Plaintiff - Appellee,

v.

GREATER RICHMOND TRANSIT COMPANY,

Defendant - Appellant.

**No. 20-1740**

WHITE COAT WASTE PROJECT,

Plaintiff - Appellant,

v.

GREATER RICHMOND TRANSIT COMPANY,

Defendant - Appellee.

Appeals from the United States District Court for the Eastern District of Virginia at Richmond.  M. Hannah Lauck, District Judge.  (3:17-cv-00719-MHL)

Argued:  September 21, 2021                    Decided:  May 20, 2022

Before GREGORY, Chief Judge, and NIEMEYER and RICHARDSON, Circuit Judges.

Affirmed in part, reversed in part, and remanded with instructions by published opinion. Judge Richardson wrote the opinion, in which Chief Judge Gregory and Judge Niemeyer joined.

Richard Earl Hill, Jr., OFFICE OF THE CITY ATTORNEY – RICHMOND, Richmond, Virginia, for Appellant/Cross-Appellee. Matthew Daniel Strugar, LAW OFFICE OF MATTHEW STRUGAR, Los Angeles, California, for Appellee/Cross-Appellant.

RICHARDSON, Circuit Judge:

When White Coat Waste Project tried to run an advertisement denouncing animal experimentation with the Greater Richmond Transit Company, the ad was denied for being impermissibly "political." So White Coat sued, challenging that denial as a violation of its First Amendment rights. Richmond Transit responds that, as a private company, it is not bound by the First Amendment, and even if it were, its policy passes constitutional muster because it only restrains speech in a nonpublic forum. The district court disagreed on both counts, concluding that Richmond Transit is a state actor subject to constitutional constraints and that its policy violates the First Amendment right to free speech. But the district court granted White Coat only partial summary judgment, holding that it could not provide the facial relief White Coat sought because public-transit political-advertising bans can sometimes accord with the Constitution. *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 303–04 (1974) (plurality opinion).

We conclude that the district court correctly identified Richmond Transit as a state actor. *See Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 400 (1995). And we hold that Richmond Transit's policy is not "capable of reasoned application" and is therefore unconstitutionally unreasonable. *See Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1892 (2018). Finally, we hold that the district court erred in denying facial relief. Even if another public-transit political-advertising ban may be constitutional, *this* ban is incapable of reasoned, constitutional application in all circumstances. So it is facially unconstitutional and warrants facial relief.

3

## I.    Background

Richmond Transit operates a public transit system in Richmond and the surrounding areas. The corporation was formed in 1973, when Virginia amended Richmond's charter to enable it to "acquire, operate, lease, or otherwise provide for the operation of a public transportation system . . . both within and outside the City of Richmond." Act of March 15, 1973, ch. 348, 1973 Va. Acts 472, 476. The City then enacted a resolution authorizing a slate of incorporators "to form a stock corporation known as 'Greater Richmond Transit Company' . . . for the purpose of providing mass transportation service as a public service corporation," and empowering the city attorney "to do all other necessary things to bring such corporation into being." Council Res. 73-R44-45, 1973 Council (Richmond, Va. 1973) (saved as ECF opinion attachment). The slate of incorporators then incorporated Richmond Transit under the general corporate law of Virginia. Richmond Transit acquired the assets of the flagging Virginia Transit Company and has operated as Richmond's conveyor of public transit ever since. At first, Richmond retained all shares of the corporation and the authority to appoint all six members of the Board of Directors, but later it granted half of its ownership and three seats on the Board to nearby Chesterfield County.

Like many transit companies, Richmond Transit derives revenue from selling advertising space on its buses. Advertisers must comply with Richmond Transit's advertising policy, which prohibits, for example, alcohol and tobacco advertisements, advertisements for pornography, advertisements containing vulgarity, and (most relevant here) "[a]ll political ads." J.A. 159 (2013 advertising policy); J.A. 156 (2018 advertising policy). Richmond Transit's policy declares its "intent not to allow any of its transit

4

vehicles or property to become a public forum for dissemination, debate, or discussion of public issues." J.A. 156, 159. But the policy fails to define what could constitute "political ads" or "public issues."

Richmond Transit generally uses an outside contractor to sell its advertising space. If that contractor believes an ad may violate the advertising policy, it must submit the ad to Richmond Transit for review. Those submissions go to the Director of Communications, Carrie Rose Pace. According to Pace, an advertisement will be rejected as political if it is "not viewpoint neutral"—i.e., any ad "expressing a viewpoint and only that viewpoint." J.A. 231. And any advertisement from what it calls a "political action group"—i.e., any group that "engage[s] in a specific targeted policy advocacy that would be related to their one side of the political issue"—is prohibited. J.A. 263. To determine whether a group is a political action group, Pace may review the organization's website.

Implementing the political-ad policy has required making some difficult decisions. Richmond Transit has run advertisements for the vice-presidential debate, a free-expression exhibit at an art museum, and an anti-dog-fighting nonprofit asking readers to spay and neuter their dogs. It rejected an advertisement from the Physicians Committee for Responsible Medicine encouraging local hospitals to "go #FastFoodFree!" and readers to "EAT MORE CHICKPEAS!," and another from a hospital association advocating for increased government healthcare funding. J.A. 294–95, 302–04, 381.

White Coat is a nonprofit seeking to end taxpayer-funded animal experimentation. It sought to run an ad on Richmond Transit's buses targeting the local McGuire Veterans Affairs Medical Center. The advertisement features three dogs peering out of what appear

5

to be prison bars, along with the text: "Prisoners of Waste—McGuire VAMC: Stop Taxpayer-Funded Dog Experiments!" J.A. 388. In small print in the bottom-left corner, the advertisement states: "White Coat Waste Project." J.A. 388. Pace reviewed White Coat's website and determined that White Coat was a political action group, so she rejected the advertisement. Richmond Transit informed White Coat that if it partnered with the local government, it might be able to run the ad as a "public service advertisement." J.A. 411.

White Coat instead sued Richmond Transit under 42 U.S.C. § 1983, asserting that Richmond Transit's prohibition on political advertising infringes their freedom of speech under the First Amendment.[1] The Complaint sought (1) a declaratory judgment that the political-advertising ban was unconstitutional, both facially and as applied to White Coat; (2) an injunction requiring Richmond Transit to accept White Coat's advertisement on terms no less favorable than those given to other advertisers; and (3) an injunction barring enforcement of the political-advertisement prohibition.

Following discovery, the district court granted partial summary judgment to White Coat. First, the court held that Richmond Transit could be sued under § 1983 as it acted under the color of state law in rejecting White Coat's advertising. Then the court held that the policy was unconstitutional as applied to White Coat under the First Amendment and enjoined Richmond Transit from applying the prohibition to White Coat. But the court

---

[1] White Coat also argued the ban is unconstitutionally vague under the Fourteenth Amendment. But we need not address that separate ground for relief considering our First Amendment holding.

rejected the facial challenge, granting partial summary judgment to Richmond Transit on that claim. *White Coat Waste Project v. Greater Richmond Transit Co.*, 463 F. Supp. 3d 661, 713 (E.D. Va. 2020). The parties cross-appealed. We have jurisdiction over the district court's final judgment. *See* 28 U.S.C. § 1291.[2]

## II. Discussion

We begin with the state-action issue and hold that Richmond Transit is a state actor operating "under color of state law." *See West v. Atkins*, 487 U.S. 42, 48 (1988). Richmond Transit is therefore subject to suit under §1983. We then hold that its political-ad ban violates the First Amendment.

### A. State Action and Color of State Law

Like many constitutional provisions, "the Free Speech Clause prohibits only *governmental* abridgment of speech," not "*private* abridgement of speech." *Manhattan Cmty. Access Corp. v. Halleck*, 139 S. Ct. 1921, 1928 (2019). So courts must ensure "that constitutional standards" such as the First Amendment are only enforced "when it can be

---

[2] "When faced with cross-motions for summary judgment, we consider 'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Bacon v. City of Richmond*, 475 F.3d 633, 637–38 (4th Cir. 2007) (quoting *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003)). "We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court and viewing the facts and inferences drawn from the facts in the light most favorable to . . . the nonmoving party." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 958 (4th Cir. 1996). And we apply the same de novo standard when reviewing the district court's denial of summary judgment. *Cannon v. Vill. of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018). "Summary judgment is appropriate only when 'there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Evans*, 80 F.3d at 958.

said that the State is responsible for the specific conduct of which the plaintiff complains"—a requirement known as "state action." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (emphasis omitted) (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). Alongside the constitutional state-action limitation, § 1983 contains a distinct color-of-law requirement. *See West*, 487 U.S. at 48. The statute applies, by its terms, only to a "person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory" deprives a person of a constitutional or statutory right, privilege, or immunity. 42 U.S.C. § 1983. A person, which includes a corporation, acts "under color of" state law when they exercise "power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West*, 487 U.S. at 49 (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

While the constitutional state-action and statutory color-of-law requirements are technically distinct, courts treat them "as the same thing." *United States v. Price*, 383 U.S. 787, 794 n.7 (1966).[3] "The ultimate issue in determining whether a person is subject to suit under § 1983 is the same question" as the state-action inquiry: "is the alleged infringement of federal rights 'fairly attributable to the State?'" *Rendell-Baker v. Kohn*,

---

[3] The Supreme Court has reserved the possibility that there may be some set of cases in which the color-of-law requirement is satisfied even where the state-action requirement is not. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 n.18 (1982). And § 1983 only covers actions under the color of *state* law. But because both requirements must be satisfied when challenging a state's conduct under the First Amendment, it is adequate to find that the stricter state-action requirement is satisfied. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 838 (1982).

457 U.S. 830, 838 (1982). Often, that means asking whether there is a "close nexus" between the government and the conduct being challenged. *See Brentwood Acad.*, 531 U.S. at 295 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). But this appeal presents a more basic question: What is the government?

Often, the answer is clear. The army is the government. *See Goldman v. Weinberger*, 475 U.S. 503, 507 (1986). So is a municipal zoning board. *See Vill. of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 389 (1926). And usually, private corporations are not the government. *See Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 721–22 (1961); *cf. Trs. of Dartmouth Coll. v. Woodward*, 17 U.S. (4 Wheat.) 518, 636–37 (1819) (Marshall, C.J.) ("But this [corporate] being does not share in the civil government of the country, unless that be the purpose for which it was created. . . . It is no more a State instrument, than a natural person exercising the same powers would be."). Usually, but not always.

In *Lebron*, the Supreme Court noted a special class of corporate entities, "Government-created and -controlled corporations," that are part of the government despite their ostensibly private character. 513 U.S. at 397. The Court there confronted a similar case to our own: The National Railroad Passenger Corporation, commonly known as Amtrak, refused to display a political advertisement, which prompted a First Amendment challenge. *Id.* at 376–77. Amtrak argued that it was a corporation, not a government entity, so it was not bound by the First Amendment. *Id.* at 392.

The Supreme Court disagreed, holding Amtrak was a government entity. *Id.* at 400. The government is afforded administrative flexibility to achieve its ends, but organizational

9

creativity cannot release it from its constitutional mandates: "It surely cannot be that government, state or federal, is able to evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form. On that thesis, *Plessy v. Ferguson* can be resurrected by the simple device of having the State of Louisiana operate segregated trains through a state-owned Amtrak." *Id.* at 397 (citation omitted). Instead, the Court held that where "the Government creates a corporation by special law, for the furtherance of governmental objectives, and retains for itself permanent authority to appoint a majority of the directors of that corporation, the corporation is part of the Government for purposes of the First Amendment." *Id.* at 400.

So *Lebron* establishes that a corporation is "Government-created and -controlled" and part of the government for purposes of the First Amendment where: (1) creation of the corporation occurred by "special law"; (2) creation was "for the furtherance of governmental objectives"; and (3) retention by the government of "permanent authority to appoint a majority of the directors of that corporation." *Id.* at 397, 400.[4] Richmond Transit satisfies all three elements.[5]

---

[4] Note that the *Lebron* test differs from those state-action theories that focus on whether a particular *action* of a private actor is "fairly attributable to the State." *Rendell-Baker*, 457 U.S. at 838. A government-created and -controlled corporation is part of the government itself and is a state actor for all purposes, just like any other government entity.

[5] White Coat urges that *Lebron*'s three prongs are merely one way that a corporation might be government-created and -controlled, and so *Lebron* does not require each to be satisfied in all cases. *See Horvath v. Westport Libr. Ass'n*, 362 F.3d 147, 153–54 (2d Cir. 2004) (*Lebron* satisfied where exactly half of the corporation's board was government-appointed); *but see Richardson v. Hartford Pub. Libr.*, 969 F. Supp. 2d 237, 244 (D. Conn. 2013) (*Lebron* and *Horvath* not satisfied where five of seventeen board members were (Continued)

10

### 1. Creation by Special Law

To understand what constitutes creating a corporation by "special law," we turn first to *Lebron*. Amtrak's creation was authorized by the Rail Passenger Service Act of 1970, Pub. L. 91-518, 84 Stat. 1327 (repealed 1994). *Lebron*, 513 U.S. at 384.[6] The Act did not incorporate Amtrak under a federal charter, but merely authorized the executive branch to file the articles of incorporation. Rail Passenger Service Act, § 301–02, 84 Stat. at 1330. The executive branch exercised the Act's authority by appointing agents, who then formed Amtrak under the general corporate law of the District of Columbia. *Lebron*, 513 U.S. at 385. The Supreme Court determined that this Act was a "special law." *See id.* at 399 ("[W]here, *as here*, the Government creates a corporation by special law . . . ." (emphasis added)). Thus, the "special law" prong is satisfied when a law authorizes the incorporation of a particular entity, including when a law does not explicitly create the corporation but authorizes the government to form the corporation later. This is true even when that authority is used to create the entity under the general corporate law of a state. Such a

---

government-appointed). Because all three prongs are satisfied here, we need not reach this issue.

[6] Though now repealed, the relevant statutory provisions at the time stated: "There is authorized to be created a National Railroad Passenger Corporation. The Corporation shall be a for profit corporation, the purpose of which shall be to provide intercity rail passenger service, employing innovative operating and marketing concepts so as to fully develop the potential of modern rail service in meeting the Nation's intercity passenger transportation requirements." Rail Passenger Service Act, § 301, 84 Stat. at 1330. It also stated that "[t]he President of the United States shall appoint not fewer than three incorporators," who "shall take whatever actions are necessary to establish the Corporation, including the filing of the articles of incorporation, as approved by the President." *Id.* § 302, 84 Stat. at 1330.

corporation is in one sense a creature of general corporate law; but the government authorized it under a special law too, so it was created by "special law."

Despite *Lebron*, Richmond Transit argues that a "special law" must actually charter the corporation, directly bringing it into being. That would suffice. *See, e.g.*, *Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 83–84 (2d Cir. 2000) (holding that Yale College's charter, recognized in Connecticut's constitution, was a "special law"), *abrogated on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002); *Hall v. Am. Nat'l Red Cross*, 86 F.3d 919, 921 (9th Cir. 1996) (holding that the Red Cross, reincorporated under a federal charter, was created by "special law"). But under *Lebron*, it is unnecessary.

Richmond Transit alternatively argues that a "special law" must lay out unique rules for the organization and functioning of the corporation. Because Richmond's resolution authorizing Richmond Transit's creation did not provide special rules—instead relying on the default rules of Virginia corporate law to dictate Richmond Transit's form—Richmond Transit submits that it was not a special law.

We reject that interpretation for two reasons. First, it would undermine the core principle of *Lebron*: that the government cannot evade the Constitution by resorting to a corporate form. *Lebron* focuses on substance, not the formal details of a corporation's structure—whether the government chose to structure the corporation under the default rules of general corporate law or to opt out and organize it differently. It cannot be that government can evade the most solemn obligations imposed in the Constitution by simply resorting to the corporate form prescribed by a state's general corporate law. *See Lebron*,

12

513 U.S. at 397. Second, Richmond Transit's proposed interpretation of the phrase "special law"—a law providing detailed rules for the corporation—is inconsistent with the actual meaning of "special law." That a law is detailed, providing specific rules for the corporation, does not make it "special."[7] A corporation created by such a law would be a "special" corporation (i.e., "of a distinct or particular kind or character"), since its structure would be unique from other corporations. But that does not mean that the *law creating it* would be "special."

Instead, we conclude that "created by special law" means something simpler than Richmond Transit suggests: The government must form the corporation under a particular legal grant of authority. In other words, the incorporation of the entity must be authorized by a law "having a specific or particular function" or "purpose," under which the corporation is formed. In that sense, "special" operates simply to clarify that *Lebron* does not apply to all corporations, even though almost all corporations are created by a state's general corporate law in a technical sense. *See* James D. Cox & Thomas Lee Hazen, Business Organizations Law § 1.2 (5th ed. 2020); *cf. Trs. of Dartmouth Coll.*, 17 U.S. (4 Wheat.) at 637 (noting that a corporation does not become "a part of the civil government

---

[7] According to *Random House Webster's College Dictionary* (2d rev. ed. 2000), "special" may mean:
1. "of a distinct or particular kind or character"
2. "pertaining or peculiar to a particular person, thing, instance, etc.; distinctive"
3. "having a specific or particular function, purpose, etc."
4. "distinguished from what is ordinary or usual"
5. "extraordinary; exceptional"
6. "particularly valued"

of the country" merely "because its existence, its capabilities, its powers, are given by law"). Nor would it apply to a corporation formed by a government actor who is acting in a private capacity. Rather, the *Lebron* test is only satisfied where the government creates a corporation under specific legal authority.

Language in *Lebron* makes this clear. The Court describes government-created and -controlled corporations as those where the government "has *specifically created that corporation* for the furtherance of governmental objectives, and not merely holds some shares but controls the operation of the corporation through its appointees." 513 U.S. at 399 (emphasis added).[8] Thus, the key is *specific government creation*. When a law authorizes government actors to incorporate entities for the government's purposes, and the actor forms a corporation under that authority, "the Government creates a corporation by special law." *Id.* at 400.

---

[8] *Kerpen v. Metropolitan Washington Airport Authority*, 907 F.3d 152 (4th Cir. 2018), presents a helpful counterexample where a law did not authorize formation of a corporation. *Kerpen* dealt with a litany of constitutional challenges to the Metropolitan Washington Airport Authority, a joint venture between the federal government and the governments of Virginia and the District of Columbia. *Id.* at 156–57. Because the plaintiff made challenges under Articles I and II of the Constitution, we needed to determine whether the Airport Authority was part of the *federal* government specifically. *Id.* at 158. Concluding that it was not, we noted that no "special law" existed because the federal statute about the Airport Authority did not authorize its formation. *Id.* at 159. Instead, the Airport Authority was created when Virginia and the District of Columbia passed reciprocal laws in 1985. *Id.* So when Congress enacted the Transfer Act, 49 U.S.C. § 49106, the next year—which authorized the Secretary of Transportation to lease the airports to the Airport Authority—it did not authorize the creation of the Airport Authority (which already existed), it "simply specified the minimum powers [the Airport Authority] must have in order to lease Dulles and National." *Id.* at 159 (citations omitted). So *federal* law played no role in specifically authorizing the creation of the Airport Authority. *Id.*

Here, Virginia authorized Richmond to "acquire, operate, lease, or *otherwise provide for the operation of* a public transportation system." Act of March 15, 1973, ch. 348, 1973 Va. Acts at 476 (emphasis added). This empowered Richmond to incorporate a public-transit corporation, which it did by specifically creating Richmond Transit in its April 1973 resolution. That resolution expressly authorized a group of "incorporators" to create the "Greater Richmond Transit Company . . . for the purpose of providing mass transportation service as a public service corporation," and empowered Richmond's attorney to "do all other necessary things to bring such corporation into being." Richmond Council Res. 73-R44-45. When the incorporators acted to form Richmond Transit, they were doing so not as private citizens or as ministerial approvers of a private corporation, but as agents of the state, acting under Virginia's statutory grant of authority as delegated to them by Richmond. Richmond Transit therefore owes its existence to two "special laws" of the state[9] that authorized its creation; that it relies on general Virginia corporate law for its internal structure is irrelevant.

Our conclusion today is not undermined by our decision in *Philips v. Pitt County Memorial Hospital*, 572 F.3d 176 (4th Cir. 2009). There we considered a hospital owned by the nonprofit corporation Pitt County Memorial Hospital, Inc. We said that the hospital corporation "was not created by special law" but "created in 1953, presumably at the instance of Pitt County, under the general nonprofit incorporation statutes of North

_____

[9] The legislative powers of Virginia municipalities derive from the Commonwealth. *See City of Richmond v. Confrere Club of Richmond, Va., Inc.*, 387 S.E.2d 471, 473 (Va. 1990).

15

Carolina." *Id.* at 186. It is not clear this was a holding: Philips apparently did not challenge the district court's ruling on the *Lebron* test. *See id.* (observing that the plaintiff "cites *Lebron* but once in his briefing, and he does not point us to any allegation in the complaint in satisfaction of the special law requirement"). But even if it were a holding, *Philips* is distinguishable from this case.

In *Philips*, we lacked evidence that Pitt County had expressly authorized the creation of the hospital corporation. Instead, we described the hospital corporation as having been "created in 1953, presumably at the instance of Pitt County, under the general nonprofit incorporation statutes of North Carolina." *Id.* First, as conveyed by the word "presumably," we were unsure of how much Pitt County was involved with the corporation's formation. And we presumed only that the hospital corporation was created "at the instance of" Pitt County (i.e., "at the urging or suggestion of" Pitt County, *Instance*, Random House Webster's College Dictionary (2d revised ed. 2000)), not by government designees acting under a law authorizing its formation.

In summary, Richmond Transit owes its existence to particularized laws authorizing Richmond to incorporate it. So it was created by "special law" under *Lebron*.

### 2.      Creation for the Furtherance of Governmental Objectives

Having found Richmond Transit was created by "special law," we next ask if it was created to further governmental objectives. While some cases might present difficult questions of what counts as a "governmental objective," this case does not. Virginia's original statutory grant authorized Richmond to "provide for the operation of a public transportation system," Act of March 15, 1973, ch. 348, 1973 Va. Acts at 476, and

16

Richmond's enacting resolution makes plain that "the corporation shall be organized for the purpose of providing mass transportation service as a public service corporation," Richmond Council Res. 73-R44-45. And we know from *Lebron* that public transportation is a governmental objective. *See* 513 U.S. at 383–84, 400. So Richmond Transit was created to further governmental objectives.[10]

### 3. Government Appointment of Directors

Richmond Transit also satisfies the final aspect of *Lebron*—that the government "retains for itself permanent authority to appoint a majority of the directors of that corporation." 513 U.S. at 400. The City of Richmond appoints half of Richmond Transit's board, with Chesterfield County appointing the other half. Thus, the government[11] appoints all of Richmond Transit's board, and retains—through ownership of Richmond Transit's stock—the permanent authority to do so.

---

[10] Note that *Lebron*'s "governmental objectives" inquiry is different from the "public function" state-action test, in which we ask whether there has been an "exercise by a private entity of powers traditionally exclusively reserved to the State." *Jackson*, 419 U.S. at 352. *Lebron*'s "governmental objectives" inquiry looks not to the function the entity performs, but the government's objective in creating it. And that objective need not be one exclusively charged to the government. Accordingly, many things that are not traditional and exclusive public functions under *Jackson*—such as higher education—may still be valid "governmental objectives" under *Lebron*. *See Hack*, 237 F.3d at 84 ("[H]igher education is a government objective (although not the exclusive province of government).").

[11] Although two different local governments equally split the appointment power, both exercise the power of the Commonwealth of Virginia, *see Confrere Club of Richmond*, 387 S.E.2d at 473, and so are both "the government" for our purposes.

Richmond Transit challenges this conclusion by claiming that the directors are not "policymakers," pointing to language from *Lebron* that the government must exercise control "not as a creditor but as a policymaker." 513 U.S. at 399. That language in *Lebron* distinguished Amtrak from Conrail, a company in which the government temporarily appointed a majority of board members. *Id.* The Court noted that the government assumed control of Conrail only temporarily to ensure that it would repay obligations it owed to the United States. *Id.* The government-appointed board members fulfilled only that purpose, and their voting power would cease after enough of that debt was repaid. *Id.* This is not the role that Richmond and Chesterfield County have in the operation of Richmond Transit. Under Richmond Transit's bylaws, the board members appointed by the two government entities exercise, directly or indirectly, "[a]ll powers of the corporation" and manage all "business and affairs of the corporation." J.A. 490; *accord* Va. Code Ann. § 13.1-673. So the government-appointed directors set the "policy" of Richmond Transit, including the advertising policy challenged before us.

Richmond Transit also relies extensively on language from *Philips* about control of the corporation, suggesting that the third *Lebron* element is satisfied only if government actors directed the policy at issue. But *Philips* did not consider control in the context of the *Lebron* test. Its discussion of control related to the distinct "entwinement" and "close nexus" state action inquiries. *Philips*, 572 F.3d at 182–84. *Philips*'s discussion of *Lebron* occurred in a separate section of the opinion, and it did not address the control element. *See id.* at 185–86. And adopting Richmond Transit's position would directly contradict *Lebron*, where just as here, the challenged rejection of the advertisement came from

18

ostensibly private employees. *See* 513 U.S. at 377. Indeed, the point of *Lebron* is to determine whether these ostensibly private decisionmakers are, for § 1983 and constitutional law, state decisionmakers. All that the *Lebron* test requires is that the government control the corporation by appointing a majority of its board, which is true here.

Because all three elements of the *Lebron* test are satisfied, Richmond Transit is a part of the government for constitutional purposes and acts under the color of state law for purposes of § 1983.[12] *See id.* at 378 (suggesting official actions of the state are necessarily state action); *West*, 487 U.S. at 49 ("[I]f a defendant's conduct satisfies the state-action requirement . . . 'that conduct [is] also action under color of state law and will support a suit under § 1983.'" (third alteration in original) (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 935 (1981))).

### B. Violation of Constitutional Rights

We next turn to whether Richmond Transit has violated White Coat's constitutional right of free speech. White Coat asserts Richmond Transit's political-advertising ban violates its First Amendment rights as an unreasonable prohibition of speech.

The First Amendment prohibits laws "abridging the freedom of speech." U.S. Const. amend. I. It limits, among other things, the government's power to regulate speech

---

[12] Because Richmond Transit is itself a part of the State, we need not consider the district court's alternative basis for finding state action—that Richmond Transit is "pervasive[ly] entwine[d]" with the State such that its actions are "fairly attributable" to it. *See Brentwood Acad.*, 531 U.S. at 291, 295.

on public property.  But "[e]ven protected speech is not equally permissible in all places and at all times."  *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799 (1985).  "The State, no less than a private owner of property, has the power to preserve the property under its control for the use to which it is lawfully dedicated."  *Greer v. Spock*, 424 U.S. 828, 836 (1976) (quoting *Adderley v. Florida*, 385 U.S. 39, 47 (1966)).  So while the First Amendment applies on government property, its scope depends on "the nature of the property" and "the disruption that might be caused by the speaker's activities."  *Cornelius*, 473 U.S. at 800.  In short, the nature of the government property (or "forum") determines the permissible scope of government control.  *Id.*

Courts have identified several types of such government-owned forums with differing degrees of free-speech protection.  "Traditional public forums" are "'public places' historically associated with the free exercise of expressive activities, such as streets, sidewalks, and parks," and governments have limited leeway to restrict speech in such forums.  *United States v. Grace*, 461 U.S. 171, 177, 180 (1983).  The government may designate other property—lacking that historical association with free expression—as a public forum by opening the property for expressive activity.  *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992).  These "designated public forums"— which include, for example, a government-owned auditorium—follow the same rules as traditional public forums.  *See id.*; *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555 (1975).  But the third category is the one relevant here:  "nonpublic forums."  "Public property which is not by tradition or designation a forum for public communication" is a nonpublic forum, where the government has wider latitude to limit speech.  *Perry Educ.*

20

*Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). Speech limitations in these nonpublic forums "must survive only a much more limited review"—they only need to be reasonable and viewpoint-neutral. *Int'l Soc'y for Krishna Consciousness,* 505 U.S. at 679.[13]

Bus advertising space is not a place historically held open for free speech, and so is not a traditional public forum. *Lehman v. City of Shaker Heights*, 418 U.S. 299, 303 (1974) (plurality opinion). There was some dispute below on whether bus advertisement space is a designated public forum or a nonpublic forum. On appeal, however, White Coat appears to acquiesce to treating the forum as nonpublic. In any event, we conclude that bus advertising space is a nonpublic forum.

Distinguishing between nonpublic and designated public forums requires examining both the expressed policy of the government and the "nature of the property and its

---

[13] For simplicity here, we have identified three forums. But there is considerable confusion over whether there are three or four types of free-speech forums. Courts have provided conflicting guidance on whether "limited public forum" is (1) a synonym for or subtype of "designated public forum"; (2) a synonym for "nonpublic forum"; or (3) a completely separate fourth category. *See, e.g.*, *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 215–16 (2015) (separately considering whether Texas license plates were a traditional, designated, limited, or nonpublic forum); *Mansky*, 138 S. Ct. at 1885 ("Generally speaking, our cases recognize three types of government-controlled spaces: traditional public forums, designated public forums, and nonpublic forums."); *Int'l Soc'y for Krishna Consciousness*, 505 U.S. at 678 ("The second category of public property is the designated public forum, whether of a limited or unlimited character . . . ."); *Am. Freedom. Def. Initiative v. King Cnty.*, 577 U.S. 1202, 1202–03 (2016) (Mem.) (Thomas, J., dissenting from denial of cert.) ("[A] limited public forum (also called a nonpublic forum) . . . ."); *Warren v. Fairfax Cnty.*, 196 F.3d 186, 193 (4th Cir. 1999) ("So-called 'designated public fora' (often called 'limited public fora') . . . ."). Because neither party claims on appeal that transit advertising space is a limited public forum—whatever that might mean—we need not wade into this morass.

21

compatibility with expressive activity." *Cornelius*, 473 U.S. at 802. The government creates a designated public forum "only by intentionally opening a nontraditional forum for public discourse." *Id.* Thus, if Richmond Transit has not intentionally opened up the advertising space on its buses to public discourse, that advertising space is a nonpublic forum.

Richmond Transit's expressed policy is not to open its advertising space for the discussion of public issues, and paid bus advertisements are not particularly compatible with the free flow of ideas. Thus, as the Supreme Court and our sister circuits have concluded, transit advertising space is a nonpublic forum. *See Lehman*, 418 U.S. at 301– 02 (plurality opinion) (holding that transit advertising was not a public forum); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 218 (2015) (characterizing *Lehman* as holding "the advertising space on city buses to be a nonpublic forum"); *see also Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314, 322–23 (D.C. Cir. 2018); *Children of the Rosary v. City of Phoenix*, 154 F.3d 972, 977–78 (9th Cir. 1998).[14]

---

[14] We also note that advertising on public transit does not constitute "government speech," which is limited to where "the State is speaking on its own behalf." *Walker*, 576 U.S. at 214–15. Bus advertisements, unlike a car's license plate, are "located in a context (advertising space) that is traditionally available for private speech" and bears "no indicia that the speech was owned or conveyed by the government." *Id.* at 218. Nor is transit advertising historically a forum for exclusively governmental messages. *See Shurtleff v. City of Boston*, No. 20-1800, __ U.S. __, slip op. at 6 (May 2, 2022) (identifying as relevant factors (1) the history of the expression; (2) the public's perception of the speaker; and (3) the government's control over the speech). And while Richmond Transit exercised some editorial control over the advertisements, *cf. id.*, this control is insufficient to overcome the history and public perception of transit advertising—both of which strongly indicate private, not government speech.

So we turn to whether Richmond Transit's policy meets the minimum standards applicable to nonpublic forums.

If government is to function, it must be permitted to maintain a subset of its property for certain limited uses without opening it for people to "propagandize protests or views . . . whenever and however and wherever they please." *Greer*, 424 U.S. at 836 (quoting *Adderley*, 385 U.S. at 48). This control includes "the right to make distinctions in access on the basis of subject matter and speaker identity." *Perry Educ. Ass'n*, 460 U.S. at 49. So courts have "long recognized that the government may impose some content-based restrictions on speech in nonpublic forums, including restrictions that exclude political advocates and forms of political advocacy." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885–86 (2018) (citing *Lehman*, 418 U.S. at 303–304).

But even in nonpublic forums, the government lacks complete freedom: any speech restrictions must still be "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46. So speech restrictions in nonpublic forums must be both (1) reasonable and (2) viewpoint-neutral. *Child Evangelism Fellowship of Md., Inc. v. Montgomery Cnty. Pub. Schs.*, 457 F.3d 376, 383 (4th Cir. 2006). White Coat argues that the Richmond Transit's policy fails on both counts.

We therefore turn to consider whether Richmond Transit's prohibition is reasonable. The reasonableness of a nonpublic-forum speech restriction follows the same familiar means-ends framing with which all first-year law students are familiar. Reasonableness demands more than a rational basis for the rule: "[I]t isn't enough simply to establish that

23

the regulation is rationally related to a legitimate governmental objective, as might be the case for a typical exercise of the government's police power." *Multimedia Publ'g Co. of S.C., Inc. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154, 159 (4th Cir. 1993). But, on the other hand, the government need not satisfy strict scrutiny: there is no "requirement that the restriction be narrowly tailored or that the Government's interest be compelling." *Cornelius*, 473 U.S. at 808–09. So reasonableness is akin to some form of so-called intermediate scrutiny, in which the government's means and ends must both be "reasonable."

White Coat does not appear to challenge Richmond Transit's ends, accepting there is a legitimate interest in avoiding some class of politically charged advertisements. Nor could they. In *Lehman v. City of Shaker Heights*, the Supreme Court faced this very issue—a city-owned public transit system prohibited "political advertising" on its vehicles. 418 U.S. at 299–300. Lehman, a candidate for state office, sought to run an advertisement, which the city denied under the policy. *Id.* at 299–301. Justice Blackmun's plurality opinion first concluded that transit advertising space is not a public forum, but part of the "commercial venture" of the transit system, a means to "provide rapid, convenient, pleasant, and inexpensive service to the commuters of Shaker Heights." *Id.* at 301–303. It then concluded that the City's prohibition on political advertising was not "arbitrary, capricious, or invidious," but pursued "reasonable legislative objectives advanced by the city in a proprietary capacity." *Id.* at 303–04. Such a policy "minimize[d] chances of

24

abuse, the appearance of favoritism, and the risk of imposing upon a captive audience." *Id.*
at 304. So the plurality concluded the restriction complied with the First Amendment. *Id.*[15]

But even a reasonable end must not be pursued by unreasonable means. In *Mansky*,
the Supreme Court recently held that to be reasonable, nonpublic-forum speech restrictions
must be "capable of reasoned application." 138 S. Ct. at 1892. The Minnesota statute in
*Mansky* prohibited political apparel in polling places. *Id.* at 1882. The prohibition covered
not only apparel identifying a candidate in the election, but *any* apparel bearing a "political"
insignia. *Id.* at 1883. Minnesota had advanced various interpretations of the restriction,
but eventually settled on a definition that included "words and symbols that an objectively
reasonable observer would perceive as conveying a message about the electoral choices at
issue in the polling place" or symbols "promoting a group with recognizable political
views about the issues confronting voters in a given election." *Id.* at 1888–90 (cleaned up).

The Court held that restriction was incapable of reasoned application. *Id.* at 1892.
Without requiring narrow tailoring, the Court held "the State must be able to articulate

---

[15] Justice Douglas, concurring in the judgment, took an even stronger view than the
plurality, suggesting that would-be transit advertisers have no First Amendment interest.
*Lehman*, 418 U.S. at 307 (Douglas, J., concurring) ("While petitioner clearly has a right to
express his views to those who wish to listen, he has no right to force his message upon an
audience incapable of declining to receive it."). Indeed, he even suggested that permitting
advertising on public transit could violate the constitutional rights of passengers, who
would be forced, as a "captive audience," to view such advertisements. *See id.* ("In my
view the right of the commuters to be free from forced intrusions on their privacy precludes
the city from transforming its vehicles of public transportation into forums for the
dissemination of ideas upon this captive audience."). Justice Blackmun's plurality, as the
opinion decided on the "narrowest grounds," controls. *See Marks v. United States*, 430
U.S. 188, 193 (1977).

some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 1888. This does not require eliminating all discretion but merely that any discretion "must be guided by objective, workable standards." *Id.* at 1891. The Court reiterated its holding in *Lehman* that not all political speech bans in nonpublic forums would be problematic—i.e., it remains a reasonable end. *Id.* at 1885–86. But the means Minnesota used did not pass muster: "[I]f a State wishes to set its polling places apart as areas free of partisan discord, it must employ a more discernible approach . . . ." *Id.*

Just as in *Mansky*, Richmond Transit seeks to ban all "political" ads. And just as in *Mansky*, Richmond Transit has no formal definition of "political," and no written guidelines clarifying how the standard is to be applied. As the Supreme Court noted, "the word can be expansive," covering anything "of or relating to government, a government, or the conduct of governmental affairs" or "[o]f, relating to, or dealing with the structure or affairs of government, politics, or the state." *Mansky*, 138 S. Ct. at 1888 (first quoting Webster's Third New International Dictionary (2002); and then quoting American Heritage Dictionary (3d ed. 1996)). Faced with this broad, undefined standard and the directive to keep Richmond Transit's buses from becoming a forum to discuss "public issues" (whatever that might mean), employees have done their best to flesh out a reasonable test. But those attempts have fallen short.

Richmond Transit's actions make clear that it does not rely on the plain meaning of "political," as it has consistently run ads that relate to the government or politics. For example, Richmond Transit ran an advertisement for the vice-presidential debate, which is certainly "relating to . . . politics." *See id.* It also ran an advertisement for a pro-free-

26

speech art exhibit. And it has indicated that advertisements *of the government itself* are often permitted as "public service announcements." For example, Pace said that an advertisement stating "Support our troops" would *not* be political if run by the United States but *would* be political if run by someone else. On the other hand, Richmond Transit has stated that some advertisements that do not relate to the government, such as one calling for a boycott of the NFL or McDonald's, would still be "political." So an advertisement's relatedness to the government or politics is not the standard that Richmond Transit applies.

Instead, Pace explained that an advertisement is political if it is not "viewpoint neutral," defined as "expressing a viewpoint and only that viewpoint." J.A. 231. But even if we were to credit this unwritten, informal definition as authoritatively interpreting Richmond Transit's policy, *cf. Mansky*, 138 S. Ct. at 1889 (instructing that courts should consider the government's "*authoritative* constructions" of their own law (emphasis added) (quoting *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992))), it provides little clarity, *cf. id.* (observing that a "murky" construction of a policy cannot save it from First Amendment challenges). What does it mean for an advertisement to express a viewpoint? Consider two hypothetical advertisements. One, issued by McDonald's, says "Eat at McDonald's." Another, issued by an animal rights group, says "Don't Eat at McDonald's." These two advertisements express opposite viewpoints on the same issue. Yet it would seem, based on Pace's responses during her deposition, that the first ad would be accepted, J.A. 233 (stating that an advertisement to drink Canada Dry Ginger Ale would not violate the advertising policy), but the second may be rejected as political, J.A. 337. But it is hard to discern precisely why.

27

Is it because the McDonald's advertisement sells a product or service, while the anti-McDonald's advertisement does not? This explanation would seem consistent with Richmond Transit's prior practice. For example, it approved an advertisement encouraging spaying and neutering of dogs from Gracie's Guardians, which provided spaying and neutering services. It then rejected White Coat's advertisement which, despite its similar topic, did not promote a particular product or service. And Richmond Transit refused an advertisement by the Physicians Committee for Responsible Medicine asking readers to "EAT MORE CHICKPEAS!," J.A. 294, 381, but said that poultry purveyor Chick-Fil-A would be permitted to ask riders to "Eat Mor Chikin." But even if this commercial/non-commercial distinction fully explains Richmond Transit's past decisions, it is not a standard that Richmond Transit has ever identified. Indeed, our need to search out alternative rationales to justify Richmond Transit's decisions reveal that its policy, as it stands, does not provide a "sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 138 S. Ct. at 1888.

This ambiguity in the standard is compounded by the ambiguity in what it applies to. Richmond Transit may reject advertisements containing no "political" content as "political." Under Section 14 of its advertising policy, an advertisement that "[c]ontains internet address(es) and/or telephone number(s) that direct(s) viewers" to political content are also disallowed. J.A. 159. But, according to Richmond Transit, this policy applies not only to the webpage located at a listed URL, but other pages in the same domain and other

28

sites that are "linked" to that webpage.[16] This detail, which is not evident from the written policy, vastly expands the scope of the political-advertising prohibition's reach: If a company wishes to include a URL for its website on an advertisement, it may be rejected if any message anywhere on its website—or other websites it links to—meets Richmond Transit's unclear definition of political.

But even an advertisement that lacks "political" content and contains no URLs or phone numbers may *still* be rejected if Richmond Transit determines that the advertiser is a "political action group" or "political action individual." J.A. 262–63, 322–23. This rule—that groups or people that "engage in a specific targeted policy advocacy that would be related to their one side of the political issue" cannot run *any* advertisements tangentially related to their political motivations—is nowhere to be found in Richmond Transit's advertising policy. *See* J.A. 263. Yet that is precisely why White Coat's advertisement was rejected. And the precise scope of this rule is murky. For instance, Richmond Transit suggested to White Coat that, if they partnered with a local government entity, they might be able to run their anti-dog-experimentation advertisement—despite the nature of both the advertisement itself and of their organization remaining the same.

---

[16] For example, a Christian organization sought to run an advertisement that directed readers to the URL "ImPregnant.org." J.A. 248. That webpage, which had not been fully set up yet, contained no material violating Richmond Transit's policy. But a link in the corner of that webpage directed the user to the organization's primary website. Richmond Transit rejected the advertisement as religious based on the advertised URL being "linked" to a website containing religious material. J.A. 247–49.

29

When taken together, Richmond Transit's vaguely defined policies and even vaguer unwritten rules make it impossible for a reasonable person to identify what violates their advertising policy and what does not. And as in *Mansky*, the problem goes "beyond close calls or borderline or fanciful cases." 138 S. Ct. at 1891. For instance, consider an advertisement for Walmart directing a reader to Walmart.com. A reader of Richmond Transit's policy would reasonably conclude that the advertisement does not violate its advertising policy. But, unknown to that reader, Richmond Transit would then scour Walmart's website, including pages related to the company's global responsibility initiatives. If that page "expresses a viewpoint and only that viewpoint" on any of an unidentified class of public issues, the advertisement would apparently be rejected. *See* J.A. 232. And even if Walmart then decided to omit the URL from its advertisement, it might still be rejected if Richmond Transit determines Walmart to be a "political action group" under its vague interpretation of that unwritten prohibition. But even now, after years of litigation trying to define Richmond Transit's policy, it is difficult to say for sure. That is the crux of the *Mansky* problem: Richmond Transit's advertising policy does not provide "objective, workable standards" by which a decisionmaker or would-be advertiser can distinguish "what may come in from what must stay out." *Mansky*, 138 S. Ct. at 1888, 1891.

Perhaps sensing that it cannot prevail under *Mansky*, Richmond Transit argues that the case simply does not apply to public-transportation advertisements. While reasonableness is judged "in light of the purpose served by the forum," *id.* at 1886 (quoting *Cornelius*, 473 U.S. at 806), there is no reason to believe that *Mansky*'s general requirement

30

of reasonableness somehow applies only to voting precincts. If anything, the *Mansky* Court suggested the opposite: that the government has less leeway in forums other than polling places. The Court recognized the "unique context of a polling place" and the government's strong interest in "reasonably tak[ing] steps to ensure that partisan discord not follow the voter up to the voting booth, and distract from a sense of shared civic obligation at the moment it counts the most." *Id.* at 1887–88. In the Court's eyes, this created a stronger interest for imposing speech restrictions than existed in, for example, a transit setting. *See id.* (citing *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 576 (1987) (invalidating speech restrictions in the Los Angeles airport as overbroad)).

But both Richmond Transit and the district court appear to believe that there is conflict between *Lehman* and *Mansky*, and that expanding *Mansky* to transit advertisements essentially overrules *Lehman*. We disagree. As discussed, *Lehman* resolved *whether* a transit operator may prohibit political advertising. *Mansky* clarified *how* they may (and may not) do so. *Lehman* noted that the City's political-advertising ban had been employed with great consistency: "There was uncontradicted testimony at the trial that during the 26 years of public operation, the Shaker Heights system, pursuant to city council action, had not accepted or permitted *any* political or public issue advertising on its vehicles." 418 U.S. at 300–01. This indicates that the policy was capable of reasoned application; the Court was addressing the antecedent question of whether any political-advertising ban is permissible in a nonpublic forum, answering in the affirmative. And *Mansky* goes out of its way to reaffirm that holding. Reasonable political speech prohibitions remain lawful: A state can ban political insignia at precincts—it just has to offer a "more discernable"

31

standard of what a "political insignia" is than Minnesota's. *Mansky*, 138 S. Ct. at 1888, 1891–92. So too here: Richmond Transit may well be able to enact a political-advertising ban, but the ban must be capable of reasoned application. The current ban simply is not.

In reaching this conclusion, we join our two sister circuits that have considered the applicability of *Mansky* to similar public-transit political-advertising prohibitions. In *American Freedom Defense Initiative v. Suburban Mobility Authority for Regional Transportation*, 978 F.3d 481, 486 (6th Cir. 2020), the Sixth Circuit struck down a ban on "[p]olitical or political campaign advertising" by Detroit's public transit system. The court recognized that, based on *Lehman*, Detroit's transit system was pursuing a permissible *objective* in prohibiting such advertisements, but cautioned that it was still required to "adopt 'objective, workable standards' to achieve its permissible ends." *Id.* at 494 (quoting *Mansky*, 138 S. Ct. at 1891). Applying *Mansky*, the court first found that the word "political" was not definite enough to provide a workable standard on its own, and that there was no written guidance clarifying its meaning. *Id.* at 494–95. The court then found that the Detroit transit system's definition of "political" during litigation—as advocating a viewpoint on an issue on which "factions of society have taken up positions . . . that are not in agreement"—was similarly unworkable, since it could apply to a large swath of advertisements that Detroit's transit system had run, such as advertisements promoting free birth control. *Id.* at 496. Even Michigan or Ohio State football advertisements, the court remarked, would be considered "political" under the transit system's definition. *Id.* at 497. The court also balked at an aspect of the policy which, much like that of Richmond Transit,

32

prohibited organizations "associated with . . . advocacy" from running any advertisements at all. *See id.* at 496.

The Third Circuit similarly struck down a prohibition on transit advertisements that "contain[ed] political messages" or addressed "political issues," holding that *Mansky* "squarely resolve[d] the issues in [that] case." *Ctr. for Investigative Reporting v. Se. Pa. Transp. Auth.*, 975 F.3d 300, 313, 316 (3d Cir. 2020). The court observed that while *Mansky* did not purport to "set the outer limit of what a State may proscribe," it also "did not limit its holding to polling locations." *Id.* at 316. Applying *Mansky* to the prohibition before it, the court held that "the lack of structure and clear policies governing the decision-making process creates a real risk that [the advertising policy] may be arbitrarily applied," the very concern addressed by *Mansky*. *Id.* at 316–17.[17]

---

[17] While not expressly relying on *Mansky*, the Ninth Circuit has also rejected as too indefinite a transit-advertising prohibition on "'public issue' advertising, defined as advertising 'expressing or advocating an opinion, position, or viewpoint on matters of public debate about economic, political, religious or social issues.'" *Amalgamated Transit Union Loc. 1015 v. Spokane Transit Auth.*, 929 F.3d 643, 648 (9th Cir. 2019) ("To the extent that STA's position suggests the prohibition applies to any advertisement touching on any issue having any level of public debate, such an interpretation is unreasonable" given that "for most every good or service, there is some level of debate." (cleaned up)).

And contrary to Richmond Transit's insistence to the contrary, the D.C. Circuit did not reach a conflicting conclusion in *Archdiocese of Washington*, 897 F.3d at 322–23. There the court upheld a prohibition on "Advertisements that promote or oppose any religion, religious practice or belief." *Id.* at 318–19. Far from concluding that *Mansky* was inapplicable to transit advertising, the D.C. Circuit considered the prohibition under the *Mansky* test: "WMATA's prohibition on advertisements that 'promote or oppose any religion, religious practice or belief,' is narrower and more precise than simply a general ban on 'religious' or 'political' speech" and was therefore permissible. *Id.* at 340. And tellingly, the D.C. Circuit later struck down a prohibition on "political content" on custom postage stamps as violating *Mansky*, endorsing its application outside the narrow context of voting precincts. *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 449–50 (D.C. Cir. 2020); (Continued)

Today, we join our sister circuits and conclude that Richmond Transit's policy violates the First Amendment as an unreasonable nonpublic-forum speech restraint.[18] We emphasize that our holding is limited to *this specific* policy prohibiting political advertising, and we pass no judgment on whether better-defined political-advertising prohibitions or policies allowing only commercial advertising may pass constitutional muster.

## C.     Facial or As-Applied Challenge

We next turn to the question presented by White Coat's cross-appeal:   whether Richmond Transit's policy is unenforceable facially or only as applied to White Coat.  The line between facial and as-applied challenges goes to "the breadth of the remedy employed by the Court," but the line has not been particularly "well defined." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 331 (2010).  "In the First Amendment context, there are two ways for a plaintiff to mount a facial challenge to a statute.  First, the plaintiff may demonstrate that no set of circumstances exists under which the law would be valid, or that the law lacks any plainly legitimate sweep.  Second, the plaintiff may show that the law is overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Greater Balt. Ctr. for Pregnancy*

---

*see also Am. Freedom Def. Initiative v. Wash. Metro. Transit Auth.*, 901 F.3d 356, 373 (D.C. Cir. 2018) (remanding with instructions to consider whether prohibition on "political" transit advertising violates *Mansky*).

[18] Because the policy is unreasonable, we need not consider whether it is viewpoint-neutral.

*Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 282 (4th Cir. 2013) (en banc) (cleaned up) (quoting *United States v. Stevens*, 559 U.S. 460, 472–73 (2010)).

White Coat is not making an overbreadth challenge, so the sole question is whether "the [law] lacks any plainly legitimate sweep." *Id.* (alteration in original). The district court appeared to believe that *Lehman* dictated the answer to this question, because it demonstrated that a transit company could, under some circumstances, prohibit "political" advertisements. But facial invalidity does not mean that no ban on political advertising could ever be lawful. It simply means that there is no circumstance in which *this particular* ban on political advertising could be lawfully applied. *United States v. Salerno*, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which *the Act* would be valid." (emphasis added)). Thus, the fact that the Supreme Court found a similar provision constitutional in *Lehman* is not fatal to a facial challenge. In *Mansky*, for example, the Court held that the Minnesota election statute was facially unconstitutional, despite acknowledging that other states' more reasonably discernable laws banning political expression were likely constitutional. 138 S. Ct. at 1185, 1891 ("That is not to say that Minnesota has set upon an impossible task. Other States have laws proscribing displays (including apparel) in more lucid terms.").

So while some other public-transit political-advertising bans might be lawful, that does not resolve whether the challenged provision lacks any legitimate sweep; instead, we must focus on *this particular* challenged prohibition. *See Stevens*, 559 U.S. at 474. As we have already discussed, Richmond Transit's policy includes more than its written

35

prohibition on "political" advertising; it encompasses its construction of that word to prohibit advertisements that are "not viewpoint neutral" or are created by groups that "engage in a specific targeted policy advocacy that would be related to their one side of the political issue." J.A. 231, 263. We must decide whether *this particular policy*, taken as a whole, possesses any legitimate sweep.

Having already concluded that the policy is not "capable of reasoned application," it is logically unavoidable that the law lacks any legitimate sweep. If a law is "not capable" of being reasonably applied, it lacks "the ability or qualities necessary for" reasonable application, meaning it could *never* be reasonably applied. *See Capable*, Webster's New World College Dictionary (5th ed. 2018). Because reasonable application is a requirement of nonpublic-forum speech restrictions, a restriction that can never be reasonably applied necessarily lacks any legitimate sweep.

This conclusion is confirmed by considering what it would mean for Richmond Transit's policy to be unconstitutional only as applied to White Coat. An as-applied challenge is one which depends on the identity or circumstances of the plaintiff. *See Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172–73 (4th Cir. 2009) (en banc). A facial challenge can be decided "without regard to its impact on the plaintiff asserting the facial challenge." *Educ. Media Co. at Va. Tech, Inc. v. Swecker*, 602 F.3d 583, 588 (4th Cir. 2010). If we were to conclude that the law is unconstitutional only as applied to White Coat, that would reflect that White Coat's particular circumstances are somehow relevant to our decision. Yet our conclusion that Richmond Transit's policy is incapable of reasoned application does not depend on White Coat's identity or the

36

advertisement it wished to run; it depends on the vagueness and imprecision of Richmond Transit's policy in a vacuum, so the policy is facially unconstitutional.

A hypothetical drives the point home. Imagine another would-be advertiser called Black Jacket. Black Jacket tries to run an advertisement with Richmond Transit but is rejected under its political-advertising policy. Black Jacket then sues Richmond Transit. No matter what advertisement they sought to run, Black Jacket could make precisely the same argument White Coat did here: Richmond Transit's policy is vague, inconsistently enforced, and otherwise not "capable of reasoned application." And they would prevail, for exactly the same reason White Coat did here: Richmond Transit's policy provides no clear guidelines on what is or is not prohibited. The only way Richmond Transit can legitimately employ its political advertising policy moving forward is to modify it in some way—to make it more clear, less discretionary, and more reasonable. But the policy as it currently exists is unreasonable and unconstitutional as applied to every would-be advertiser, so it is facially invalid.

*          *          *

While transit companies may prohibit political advertising, they must do so by enacting a neutral policy capable of reasoned application. Otherwise, such a prohibition abridges would-be advertisers' freedom of speech and is facially unconstitutional under the First Amendment. We therefore affirm the district court's partial grant of summary judgment to White Coat, reverse its partial grant of summary judgment to Richmond Transit, and remand with instructions that the district court enter summary judgment to White Coat consistent with this opinion. The district court's judgment is

37

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED.*