[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 22-11787

_____

YOUNG ISRAEL OF TAMPA, INC.,

Plaintiff-Appellee,

*versus*

HILLSBOROUGH AREA REGIONAL TRANSIT AUTHORITY,

Defendant-Appellant,

ADELEE LE GRAND, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:21-cv-00294-VMC-CPT

_____

Before JORDAN, NEWSOM, Circuit Judges, and GRIMBERG,⋆ District Judge.

JORDAN, Circuit Judge:

The Hillsborough Area Regional Transit Authority has a policy which prohibits placing, on its vehicles and property, advertisements that "primarily promote a religious faith or religious organization." Young Israel of Tampa, Inc., an Orthodox Jewish synagogue, sued HART in federal court, alleging that its rejection of a proposed Chanukah on Ice advertisement was unconstitutional.

The district court granted summary judgment in favor of Young Israel on two grounds. First, HART's policy violated the Free Speech Clause of the First Amendment because it discriminated on the basis of viewpoint. Second, even if HART's policy was viewpoint neutral, it was unreasonable because it lacked objective and workable standards and its application and enforcement were inconsistent and haphazard.

---

⋆ The Honorable Steven D. Grimberg, United States District Judge for the Northern District of Georgia, sitting by designation.

Based on these rulings, the district court permanently enjoined HART from rejecting any advertisement on the ground that it primarily promotes a religious faith or religious organization. The injunction covered not only HART's current policy, but also any future policies.

In its appeal, HART asks us to overturn the district court's summary judgment order and hold that its policy prohibiting advertisements that primarily promote a religious faith or religious organization is a permissible content (i.e., subject-matter) regulation of a nonpublic forum, and does not constitute improper viewpoint discrimination. We decline to answer this question of first impression—which has generated a small circuit split—because we affirm the district court's alternative ruling that HART's policy, even if viewpoint neutral, is unreasonable due to a lack of objective and workable standards.

## I

At summary judgment, we review the record in the light most favorable to HART, and draw all reasonable inferences in its favor. *See Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278, 1328 (11th Cir. 2022). Having said that, the relevant facts in this case are largely undisputed.

## A

HART, a public transit agency, provides mass transportation in the City of Tampa and Hillsborough County. For a fee, it places advertisements on its vehicles and property. In 2013, HART

adopted a policy prohibiting advertisements that "primarily promote a religious faith or religious organization." The policy does not define the word "religious" or the term "primarily promote."[1]

HART refuses to accept primarily religious advertisements because of its "interests in ensuring safe and reliable transportation services and operating in a manner that maintains demand of its service to multi-cultural, multi-ethnic, and religiously diverse ridership, without alienating any riders, potential riders, employees, or advertisers." HART's policy is "intended to maintain a safe environment on its vehicles without unnecessary controversy, risks of violence, or risks of vandalism while maintaining employee morale." According to HART, religious advertisements could "be deemed either controversial" or "create a bad experience for [its] customers," particularly "if somebody didn't agree with [it] and . . . they're upset about it." HART, however, admits that it does not know "what would specifically upset customers on religious ads," and concedes that it has no record of disruptions, vandalism, or threats of violence attributable to any advertisement.[2]

---

[1] The policy contains other content-based prohibitions, including bans on partisan political advertisements and advertisements containing profanity, discriminatory messages, or depicting violence. Those aspects of the policy are not at issue here.

[2] The record does reference at least one instance of some limited complaints in 2013 when HART was considering running advertisements from the Council on American-Islamic Relations Florida deemed the #MyJihad campaign

22-11787                 Opinion of the Court                 5

Pursuant to its policy, HART has selected a contractor to conduct an initial review of proposed advertisements. The contractor is "responsible for the administration of the HART advertising program consistent with HART's adopted policies and guidelines." If a dispute remains unresolved after the contractor has determined that an advertisement is inconsistent with the advertising policy, then an "appeal may be made to the CEO or [COO] of HART or his/her designee for final resolution." The "[a]pplication of HART's advertising guidelines are fact specific and analysis of a permissible ad[vertisement], once brought to the CEO (or her designee), is done on a fact-specific basis, with assistance from counsel, when necessary."

Significantly, HART acknowledges that "there is no specific training or written guidance to interpret its . . . policy." Laurie Gage, an employee of HART's advertising contractor, testified that, outside of HART's written policy itself, there are no guidance documents, advisory opinions, or other materials available to help her implement or interpret the policy. Ms. Gage has never received any training on how to apply the policy, and she explained that if there was ever any question or concern about whether an advertisement was permissible under the policy, she would forward the issue to HART.

---

and the CAIR-FL Diversity campaign. HART concedes that these limited complaints did not amount to disruptions, incidents of vandalism, or threats of violence.

Tyler Rowland, HART's communication and creative services manager and corporate representative, is responsible for reviewing proposed advertisements. Like Ms. Gage, he testified that HART does not provide any guidance documents, advisory opinions, or other materials to help interpret or apply the policy. He also confirmed that HART does not provide training on the policy. When determining whether an advertisement "primarily promot[es]" a religious faith or organization, he acts on a case-by-case basis, depending on the advertisement's "design and . . . messaging."

HART concedes that its policy allows "different people in the same roles [to] have different methodologies." Although HART says that it is "not part of [its] practice" to review organizational websites to determine if an advertisement is primarily religious, Ms. Gage testified that she might review a religious organization's website to determine if an advertisement is primarily religious depending on "[w]hat was going on with [her] day." She explained that the application of the policy varies based on her understanding of the symbolism in an advertisement as religious. For instance, an advertisement featuring an image of Jesus Christ would result in her asking the organization whether it wanted to "pursue" the matter further, because she knows that "Jesus Christ is associated with religion." But if she "didn't know that," "then [she] probably wouldn't have a conversation, and [she] would just submit [the matter] to HART."

**B**

For more than 14 years, Young Israel has hosted a Chanukah on Ice celebration, which it has historically promoted through advertising in Jewish media and on Facebook. Young Israel's Chanukah on Ice event begins with an hour of ice skating with Jewish music playing and Jewish food available. Then the rabbi lights a large ice menorah and offers blessings. Attendees sing Jewish songs and the rabbi speaks about the Chanukah miracle—oil in the holy temple, which was meant to last only one day, lasted eight days. Chanukah on Ice is a "very big event" with "at least 200 people" typically in attendance. The event is part of the synagogue's outreach to the community and "offers a crucial opportunity to foster Jewish identity during a season many associate with Christmas."

In October of 2020, Young Israel sent HART a proposed advertisement for its Chanukah on Ice event at the Advent Health Center Ice Rink, which is near the synagogue on a HART bus line. The advertisement included—in addition to time, place, and contact information—images of a menorah, a dreidel, and skaters, and stated that the event would "featur[e] lighting of a sculpted Grand Ice Menorah and ice skating to Jewish music around the flaming menorah." For the reader's benefit, we reproduce the advertisement here.



Young Israel wanted the advertisement to run in the HART transit system from late November through December.

Ms. Gage rejected Young Israel's advertisement because "HART does not allow religious affiliation advertising[.]" Young Israel appealed, and HART's CEO, communications manager, and legal counsel met to discuss the rejection of the Chanukah on Ice advertisement. They collectively concluded that, "[b]ased off . . . legal counsel's knowledge of what the menorah meant," the advertisement primarily focused on a "religious-based icon." As a result,

Young Israel's advertisement violated HART's prohibition on religious advertisements.

Mr. Rowland then sent an email to Young Israel with "suggested edits." Those edits consisted of removing the image of the menorah and all uses of the word "menorah."[3]

Young Israel replied that HART's proposed changes were both "offensive and not possible to make" because "the lighting of the menorah is a central aspect of the Orthodox Jewish celebration of Chanukah." Young Israel requested that HART approve its "ad[vertisement] as originally designed." But the following day, HART formally refused to run the Chanukah on Ice advertisement. HART said that its decision was "consistent with prior determinations involving similar advertisement requests under th[e] policy."

## C

Young Israel responded to HART's rejection of its advertisement with a federal lawsuit. Its complaint asserted claims for violations of the Free Speech and Free Exercise Clauses of the First Amendment, as well as claims for violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Following discovery, both parties moved for summary judgment.

Young Israel argued that it was entitled to summary judgment because HART's policy violated the First Amendment's Free Speech Clause in several ways. First, it discriminated on the basis

---

[3] Mr. Rowland testified that if HART had known more about Judaism, it would have proposed eliminating the dreidel as well.

of viewpoint. Second, even if it was viewpoint-neutral, the policy constituted an unreasonable content-based restriction. Third, it was standardless and arbitrary. Young Israel also asserted that HART's policy violated the First Amendment's Free Exercise clause because it singled out religion for disfavored treatment.

HART, on the other hand, maintained that summary judgment should be granted in its favor on all of Young Israel's claims. With respect to the claims based on the Free Speech Clause, HART made several arguments. First, its property and vehicles were nonpublic forums where speech could be reasonably restricted. Second, its policy was a reasonable content-based restriction. Third, its policy had not been arbitrarily or inconsistently applied.

The district court granted summary judgment in favor of Young Israel. It held that HART's advertising policy violated the Free Speech Clause of the First Amendment, and found it unnecessary to address Young Israel's other claims. *See Young Israel of Tampa, Inc. v. Hillsborough Area Regional Transit Auth.*, 582 F. Supp. 3d 1159 (M.D. Fla. 2022).

In the district court's view, the policy discriminated on the basis of viewpoint because HART allowed advertisements for a secular holiday event with ice skating and seasonal food, but disallowed an ice skating event with seasonal food that was in celebration of Chanukah. HART's prohibition on advertisements that "primarily promote a religious faith or organization" targeted the "specific motivating ideology or the opinion or perspective of the

22-11787                Opinion of the Court                11

speaker" because HART "expressly suggested edits to [Young Is-
rael's] ad[vertisement] that removed all references to and images
of the menorah, which both parties agree[d] is considered a Jewish
religious symbol." *Id.* at 1171. Those proposed edits suggested to
the district court that HART "impliedly would have allowed an ad-
vertisement of the *exact same event* if presented with secular sym-
bols or emphasizing a secular viewpoint, but it was not allowed if
presented with religious symbols or emphasizing a religious view-
point." *Id.* (emphasis in original).

In reaching its conclusion that HART's advertising policy
discriminated on the basis of viewpoint, the district court relied on
a trilogy of cases from the Supreme Court addressing viewpoint
discrimination with respect to religion. *See id.* at 1170–71 (citing
*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384,
386–90 (1993); *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515
U.S. 819, 829 (1995); and *Good News Club v. Milford Cent. Sch.*, 533
U.S. 98, 105–06 (2001)). The district court also discussed the con-
flicting opinions of the D.C. and Third Circuits applying the trilogy
of Supreme Court cases in the context of restrictions on religious
advertisements in public transit. *See* 582 F. Supp. 3d at 1170–72.[4]

---

[4] *Compare Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314,
321–29 (D.C. Cir. 2018) (upholding a public transit authority policy banning
issue-oriented advertisements—including political, religious, and advocacy ad-
vertisements—against a challenge by a Catholic archdiocese because the pol-
icy regulated content, not viewpoint), *with Ne. Pa. Freethought Soc'y v. Cty. of
Lackawanna Transit Sys.*, 938 F.3d 424, 432–37 (3d Cir. 2019) (reversing a judg-
ment in favor of a public transit system that had enacted a policy prohibiting

The district court acknowledged that the parties disagreed about whether it had to make a threshold forum analysis determination for the advertising space on HART's vehicles and property. But it was persuaded by the Third Circuit's analysis that "'no matter what kind of property is at issue, viewpoint discrimination is out of bounds.'" *Id*. at 1168 (quoting *Freethought*, 938 F.3d at 432). The district court also concluded that the Third Circuit's approach "better conforms to the prevailing Supreme Court caselaw on the issue of religious viewpoint discrimination." *Id*. at 1170. The district court explained that Young Israel's Chanukah on Ice event was "a means of outreach to the community and an expression of Jewish identity." *Id*. at 1171. According to the district court, although HART "disallowed this statement of organizational existence, identity, and outreach," it "allowed outreach messages from Alcoholics Anonymous ("Is Alcohol a Problem? Call Alcoholics Anonymous."), the Ronald McDonald House Charities ("Joy Is One of the Best Gifts You Can Give."), and Florida Healthy Transitions ("We're here to help. You are not alone.")." *Id*. Thus, the district court concluded that HART's advertising policy, both on its face and as applied, violated Young Israel's right to free speech under the First Amendment. *See id*. at 1172.

Applying *Minnesota Voters Alliance v. Mansky*, 138 S. Ct. 1876 (2018), the district court alternatively held that even if HART's ad-

---

religious messages because it constituted viewpoint discrimination in violation of the First Amendment).

vertising policy was "viewpoint neutral," it was unreasonable because it lacked workable norms. *See* 582 F. Supp. 3d at 1173. Assuming that the prohibition on certain types of religious advertisements served permissible ends, HART's policy lacked objective, workable standards. For example, the word "religious" was "unadorned and unexplained" in the policy and is a word that has a "range of meanings and can be interpreted differently by different people." *Id.* The district court noted HART's admission that, other than the policy itself, "there [wa]s no additional written guidance or training . . . on how to interpret" the policy. *See id.* The district court also observed that HART conceded that "different people in the same roles [could] have different methodologies for reviewing submitted advertisements' compliance" with the policy. *See id.* at 1174 (internal quotation marks omitted) (alteration in the original). In the district court's view, the summary judgment record established that HART's application and enforcement of its policy violated the First Amendment because it was "inconsistent and haphazard." *Id.* at 1175.

## D

After entry of the summary judgment order, the parties submitted a proposed declaratory judgment and permanent injunction as required by the district court. *See* D.E. 74. Young Israel and HART agreed on the proposed language of the permanent injunction except with respect to the breadth of the injunction.

The injunction language submitted by the parties, with Young Israel's requested additional language in bold, was as follows:

> The Court therefore GRANTS Young Israel's request for a permanent injunction. HART, its agents and employees, and all those acting in concert with any of them, are ENJOINED, on a permanent basis, from rejecting any advertisement on the ground that the advertisement primarily promotes a religious faith or religious organization **or employs religious language, imagery, or symbols, whether** under Section 4(e) of its Advertising Policy effective as of December 2, 2013, **or otherwise**.

*Id*. at 7–8 (emphasis added). Essentially, Young Israel requested the additional language because it did not want the injunction limited to HART's current policy. HART, on the other hand, wanted the injunction to apply only to the current policy.

After supplemental briefing and oral argument, the district court resolved the dispute in Young Israel's favor. The district court enjoined HART "from rejecting any advertisement on the ground that the advertisement primarily promotes a religious faith or religious organization, whether under Section 4(e) of its Advertising Policy effective as of December 2, 2013, *or in any future advertising policy that HART might adopt and implement*." D.E. 86 at 1–2 (emphasis added). According to the district court, its chosen language was "tailored to fit the violation because it pertains directly to the language of the Advertising Policy, which was the focus of

[its] . . . summary judgment order" and it "takes into account the possibility of future HART advertising policies." *Id*. at 2.

After the district court entered its final judgment and permanent injunction, HART appealed. We set the case for oral argument.

## II

The district court's grant of summary judgment in favor of Young Israel is subject to *de novo* review. *See Williams v. Radford*, 64 F.4th 1185, 1188 (11th Cir. 2023). The same plenary standard applies to the constitutionality of HART's policy. *See Benning v. Comm'r, Georgia Dep't of Corr.*, 71 F.4th 1324, 1328 (11th Cir. 2023).

## III

HART seeks reversal on three grounds. First, it argues that the district court erred in following the Third Circuit's approach in *Freethought*, 938 F.3d at 432–37, and in concluding that its policy constituted impermissible viewpoint discrimination. Second, it asserts that its policy is reasonable under the Supreme Court's decision in *Mansky*. Third, relying on the Fourth Circuit's decision in *White Coat Waste Project v. Greater Richmond Transit Co.*, 35 F.4th 179 (4th Cir. 2022), it contends that the permanent injunction constitutes an abuse of discretion because it applies to any future policy that might restrict advertising on religious faith or religious organization grounds.

## A

The First Amendment prohibits Congress from enacting any law "abridging the freedom of speech." *See* U.S. CONST. amend. I. It applies to the states (and their political subdivisions) through the Due Process Clause of the Fourteenth Amendment. *See Edwards v. South Carolina*, 372 U.S. 229, 235 (1963) ("It has long been established that [ ] First Amendment freedoms are protected by the Fourteenth Amendment from invasion by the states.").

HART says that this case "presents an interesting question on balancing the competing interests of the First Amendment against [its] right to regulate the content of its advertising in a non-public forum." Appellant's Br. at 8. It urges us to follow the D.C. and Fourth Circuits, both of which consider the type of forum at issue before addressing the nature of the restriction, *see, e.g., WAMATA*, 897 F.3d at 321–29, and to reject the approach of the Third Circuit in *Freethought*, 938 F.3d at 432–36, which examines the question of viewpoint discrimination without first performing a forum analysis. Although it takes a different position on the merits, Young Israel also asks us to weigh in on this First Amendment question and hold that HART's policy discriminates on the basis of viewpoint. *See* Appellee's Br. at 23; Audio of Oral Arg. at 32:38.

We have not been asked to apply the Supreme Court's trilogy—*Lamb's Chapel*, *Rosenberger*, and *Good News*—to a government prohibition on advertisements that "primarily promote a religious faith or religious organization." But in a 2019 case involving a First Amendment challenge to a state prohibition on prayers at high

school football games, we stated that "[t]he first critical step in the analysis is to discern the nature of the forum at issue." *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athl. Ass'n, Inc.*, 942 F.3d 1215, 1236 (11th Cir. 2019). If we addressed the forum/viewpoint discrimination issue here—as the parties urge us to do—we would have to consider not only the impact of our decision in *Cambridge Christian* but also the different approaches taken by the D.C. and Fourth Circuits on the one hand and by the Third Circuit on the other. *Compare, e.g.*, *WMATA*, 897 F.3d at 321–29, and *White Coat*, 35 F.4th at 196–98, *with Freethought*, 938 F.3d at 432–36.

To borrow language from a Supreme Court case, "we resist the pulls to decide the constitutional issues involved [here] on a broader basis than the record before us imperatively requires." *Street v. New York*, 394 U.S. 576, 581 (1969). The district court ruled in the alternative that, even if HART's advertising policy was viewpoint neutral, it was constitutionally unreasonable because it lacked objective and workable standards. As explained below, we agree with the district court on this point, and that provides a sufficient basis on which to affirm its judgment. *See Harbourside Place, LLC v. Town of Jupiter, Fla.*, 958 F.3d 1308, 1322 (11th Cir. 2020) ("[T]his is a good opportunity for us to practice judicial minimalism, and decide no more than what is necessary to resolve [the] appeal.").

**B**

Though the analysis would not change one way or another, we'll assume, without deciding, that the HART vehicles and property at issue here are nonpublic forums as opposed to limited public forums. Even so, when the government restricts speech in nonpublic forums, it "must avoid the haphazard and arbitrary enforcement of speech restrictions in order for them to be upheld as reasonable." *Cambridge Christian*, 942 F.3d at 1243. Although a restriction need not be narrowly tailored, the government must offer a "sensible basis for distinguishing what may come in from what must stay out." *Mansky*, 138 S. Ct. at 1882.

In *Mansky*, the Supreme Court addressed a First Amendment challenge to a Minnesota law banning voters from wearing political apparel at polling places. *See id.* at 1883. The Court treated polling places as nonpublic forums, and concluded that Minnesota had pursued permissible ends because it could reasonably seek to reinforce the solemnity of voting. *See id.* at 1887–88.

The Supreme Court then turned to whether Minnesota had "draw[n] a reasonable line." *Id.* at 1888. The Court held that Minnesota had not used reasonable means to implement its ends because the ban on political apparel was not "capable of reasoned application." *Id.* at 1892. Due to the ambiguity of the word "political"—despite a list of examples Minnesota had provided—the Court ruled that the ban on political apparel could not be objectively applied. Indeed, the ban gave election judges at each polling place too much discretion to decide what qualified as "political."

*Id*. at 1891.  According to the Court, that discretion had to be "guided by objective, workable standards." *Id*.  The Court held that the ban violated the First Amendment, explaining that the states "must employ a more discernible approach than the one Minnesota offered [there]." *Id*.

We have not yet had an occasion to apply *Mansky* in the context of advertising in a public transportation setting.  We have held, however, that a Christian school plausibly alleged that a state ban on prayer over a loudspeaker at a high school football game was applied arbitrarily and haphazardly in violation of *Mansky*.  *See Cambridge Christian*, 942 F.3d at 1243–44.  Based on the allegations in the complaint, the state's decision to prohibit the prayer appeared arbitrary, capricious, and haphazard because the prohibition was enforced inconsistently—on at least four other occasions prayers during football games had been allowed.  *See id*. at 1246.  We explained that "[p]ermitting certain speech on Monday, Tuesday, Wednesday, and Thursday, and barring precisely the same message on Friday without any credible explanation of what may have changed is the essence of arbitrary, capricious, and haphazard— and therefore unreasonable—decisionmaking." *Id*. at 1244.

Several of our sister circuits have applied *Mansky* in the public transportation/advertising context.  Although their cases involved restrictions on political rather than religious advertisements, the decisions are consistent with our ruling in *Cambridge Christian*.  *See White Coat*, 35 F.4th at 199–201 (transit company's ban on "political" advertisements failed under *Mansky* because

there was no formal definition of "political" and "no written guidelines clarifying how the standard is to be applied"); *Am. Freedom Def. Initiative v. Suburban Mobility Auth. for Reg'l Trans.*, 978 F.3d 481, 493–98 (6th Cir. 2020) (similar holding); *Ctr. for Investigative Reporting v. Se. Pennsylvania Transp. Auth.*, 975 F.3d 300, 315–17 (3d Cir. 2020) (applying *Mansky* to invalidate a policy prohibiting advertisements which were "political" or which expressed an "opinion, position, or viewpoint on matters of public debate about economic, political, religious, historical or social issues").

The district court here correctly applied *Mansky*. It properly concluded that HART's advertising policy is unreasonable because it fails to define key terms, lacks any official guidance, and vests too much discretion in those charged with its application.

HART's policy prohibits "[a]dvertisements that primarily promote a religious faith or religious organization," but does not define what is a "religious faith" or "religious organization." D.E. 1-1 at 146. Although the policy defines certain terms, including "commercial advertisement," "governmental entity public service announcements," and "governmental entity," *id*. at 144–145, "the word 'religious' is unadorned and unexplained[.]" *Young Israel*, 582 F. Supp. 3d at 1173.

The word "religious" here, like the word "political" in *Mansky*, has a range of meanings. "Religious," for example, is defined as "[h]aving or showing belief in and reverence for God or a deity," as well as "[o]f, concerned with, or teaching religion." The American Heritage Dictionary of the English Language 1474 (4th ed.

2009). *See also id.* (defining "religion" as a "[b]elief in and reverence for a supernatural power or powers as creator and governor of the universe"). Although the word "religious" is used as an adjective in the policy to modify "faith" and "organization," the lack of any definition whatsoever is constitutionally problematic.

In addition, the term "primarily promote" is also left undefined in the policy. Although the word "primarily" may not generally be difficult to understand on its own, *see In re Stewart*, 175 F.3d 796, 808 (10th Cir. 1999) (defining the word as meaning "for the most part" or "more than fifty percent"), here it modifies the word "promote" for purposes of a "religious faith" or "religious organization." Does "primarily promote" equate to proselytization? If it can be something less, how much less? We are left to guess. As the Supreme Court said when faced with similarly expansive language, we simply do not know the reach, or limits, of the term "primarily promote" in this context. *See Rosenberger*, 515 U.S. at 836 ("The prohibition on funding on behalf of publications that 'primarily promot[e] or manifes[t] a particular belie[f] in or about a deity or an ultimate reality,' in its ordinary and commonsense meaning, has a vast potential reach.").

Given the inherent ambiguity of the word "religious," the uncertainty and potential breadth of the term "primarily promote," and the lack of any definitions, we agree with the district court that the policy fails to provide any objective or workable standards. The policy therefore fails under *Mansky. See Am. Freedom Def. Initiative*, 978 F.3d at 494 ("SMART cannot rely on its Advertising

Guidelines' unadorned use of the word 'political' to create workable standards by itself. The word has a range of meanings."). *Cf. WMATA*, 897 F.3d at 340 (Wilkins, J., concurring) ("Guideline 12 is . . . readily distinguishable from the [law] struck down in *Mansky*. WMATA's prohibition on advertisements that 'promote or oppose any religion, religious practice or belief,' is narrower and more precise than simply a general ban on 'religious' or 'political' speech.").

HART's policy is also completely devoid of "any official guidance to create workable standards." *Am. Freedom Def. Initiative*, 978 F.3d at 495. As the district court aptly noted, "HART admits that, outside of the [p]olicy itself, there is no additional written guidance or training given by HART on how to interpret the [p]olicy." *Young Israel*, 582 F. Supp. 3d at 1173.

This lack of guidance, as the district court explained, has caused inconsistency in how HART's agents and employees define and interpret the policy. For example, Ms. Gage testified that she would forward to HART for approval an advertisement containing Easter eggs because it was "possible" that there is a secular component to Easter. *See* D.E. 60-6 at 80. But, according to Ms. Gage, if an advertisement said "Easter," that would "maybe" necessitate a conversation with the advertiser. *See id.* at 81.

As a result, the policy vests too much unchecked discretion in HART's agents and employees. Indeed, HART concedes that "different people in the same roles [could] have different methodologies" for reviewing submitted advertisements' compliance with the policy. *See* D.E. 60-8 at 96. Such *ad hoc* decision-making is far

from the "objective, workable standards" that must guide the discretion of those who enforce HART's policy. *See Mansky*, 138 S. Ct. at 1891.

Take Mr. Rowland's view on how the policy operates. For Mr. Rowland, an advertisement promoting the reading of the Bible would be prohibited, while an advertisement touting the Book of Mormon would be fine because he does not know what that is and to him it would be "an ad about selling a book." D.E. 60-8 at 33. The Book of Mormon is, of course, a volume of sacred scripture for members of the Church of Jesus Christ of Latter-Day Saints. And one would think that it would (and should) be treated like the Bible under Mr. Rowland's view, but that does not seem to be the case. To make matters more difficult for someone like Mr. Rowland, *The Book of Mormon* is also the name of a musical parody which premiered on Broadway in 2011. *See* Trey Parker, Matt Stone, and Robert Lopez, *The Book of Mormon* (2011). If *The Book of Mormon* had a two-week run in Tampa, it is unclear to us whether HART would run or prohibit an advertisement promoting the musical. That is a big problem under *Mansky*.

The concern about inconsistent application of the policy is not conjectural. As the district court explained, *see Young Israel*, 582 F. Supp. 3d at 1175, HART rejected an advertisement from St. Joseph's Hospital based on information that the Hospital was "[f]ounded as a mission by the Franciscan Sisters of Allegany," but said it would accept the advertisement if the Hospital used the name of its parent company, Baycare. *See* D.E. 60-38. Yet HART

ran advertisements from St. Leo University—the oldest Catholic institution of higher education in Florida (established in 1889 by the Order of Saint Benedict of Florida)—without any changes because St. Leo is an "institution of higher learning, not a religious organization." D.E. 60-18; D.E. 60-37. By that logic, why wasn't St. Joseph's Hospital considered a medical institution rather than a religious organization?

HART's erratic application of its policy mirrors the problems identified by the Supreme Court in *Mansky*, 138 S. Ct. at 1891, and demonstrates that it is not capable of reasoned application. HART's reference to some undefined abstract guidance that might have been (but was not) provided is insufficient to establish reasonableness. "We cannot infer the reasonableness of a regulation from a vacant record." *Cambridge Christian*, 942 F.3d at 1246 (internal quotation marks and citation omitted).

In sum, HART has failed to define the word "religious" and the term "primarily promote," has not provided guidance that sets out "objective, workable standards" for its agents and employees, and has vested too much discretion in those who apply the policy. These deficiencies are fatal. *See Mansky*, 138 S. Ct. at 1891. Assuming without deciding that a prohibition on certain types of religious advertisements may serve permissible ends, HART has failed to create the necessary standards for "reasoned application" of its policy. *See id*. at 1891–92.

## C

HART concedes that its advertisement policy is not reasonable as applied to Young Israel, but maintains that it is reasonable on its face. *See* Appellant's Br. at 31 n.1. HART argues that its policy is "capable of reasonable application" and "[w]ith well-defined guidance on exactly 'what can come in the forum and what must stay out' [the] policy is certainly capable of reasonable application." Appellant's Reply Br. at 15–16. HART thus contends that the district court erred in ruling that its policy was unconstitutional on its face under *Mansky*.

At one level, we understand where HART is coming from. After all, the Supreme Court has sometimes said that a successful facial challenge requires a showing that the law in question is unconstitutional in all of its applications. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 745 (1987). And it has stated that a "plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010) (internal quotation marks and citation omitted). *See also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982) ("To succeed [on a facial vagueness challenge] the complainant must demonstrate that the law is impermissibly vague in all of its applications.").

In terms of *Mansky* reasonableness we can imagine a religious advertisement which clearly falls within the ban in HART's policy—think of an advertisement for a well-known faith which

26                    Opinion of the Court                    22-11787

singularly declares that it is the only true religion and urges readers to become believers ("____ism is the only way to salvation, so come worship at _____ and convert now before it is too late").  Such an advertisement would "primarily promote" a "religious faith" and would not be vague as applied.[5]

The problem for HART is that in its more recent cases the Supreme Court has cut back on the broad statement in *Salerno*, at least when vagueness is the constitutional vice.  *See, e.g.*, *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212, 1218–23 (2018) (civil immigration statute providing for removal); *Johnson v. United States*, 576 U.S. 591, 602–03 (2015) (criminal sentencing statute).  At the end of the day, we are not persuaded by HART's argument that the policy is unconstitutional only as applied to Young Israel.

First, the reasonableness holding in *Mansky* concerned the facial validity of the Minnesota statute, as the as-applied claim in the case was not before the Supreme Court.  *See Mansky*, 138 S. Ct. at 1885 ("MVA, Cilek, and Jeffers . . . petitioned for review of their facial First Amendment claim only.").  No wonder, then, that our sister circuits treat *Mansky* reasonableness challenges as facial.  *See Ostrewich v. Tatum*, 72 F.4th 94, 105–06 (5th Cir. 2023); *White Coat*,

---

[5] We mean only that this hypothetical advertisement would be prohibited by HART's policy.  We express no view on whether such a prohibition would be constitutional.

35 F.4th at 204; *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 436 (D.C. Cir. 2020). We do the same here.[6]

Second, as a logical matter, a law (or, as here, a policy) found to be constitutionally unreasonable under *Mansky* due to lack of standards and guidance is by definition facially invalid. *See Kolender v. Lawson*, 461 U.S. 352, 361 (1983) ("We conclude [that the statute] is unconstitutionally vague on its face because it encourages arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute."); *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988) (the First Amendment problem of placing "unbridled discretion" in the hands of government officials "can be effectively alleviated only through a facial challenge"). Our "conclusion that [HART's] policy is incapable of reasoned application does not depend on [Young Israel's] identity or the advertisement it wished to run; it depends on the vagueness and imprecision of [HART's] policy in a vacuum, so the policy is facially unconstitutional." *White Coat*, 35 F.4th at 204.

## IV

The distinction between facial and as-applied challenges, though sometimes difficult to discern, generally "goes to the breadth of the remedy." *Citizens Utd. v. Fed. Election Comm'n*, 558

---

[6] Some have suggested that the "animating logic" of *Mansky* comes from a line of vagueness cases concerned with "arbitrary enforcement," even though the Supreme Court did not mention the vagueness doctrine by name. *See* Note, *The Supreme Court 2017 Term—Minnesota Voters Alliance v. Mansky*, 132 Harv. L. Rev. 337, 344–46 (2018).

U.S. 310, 331 (2010). So we turn to the scope of the permanent injunction.

To obtain a permanent injunction, a plaintiff must show (1) that he has suffered an irreparable injury; (2) that his remedies at law are inadequate; (3) that the balance of hardships weighs in his favor; and (4) that a permanent injunction would not disserve the public interest. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). The district court here did not err in issuing a permanent injunction. *See Six Star Holdings, LLC v. City of Milwaukee*, 821 F.3d 795, 803 (7th Cir. 2016) ("[A] facial challenge usually invites prospective relief, such as an injunction[.]"). Indeed, no one disputes that a permanent injunction was appropriate. The parties' disagreement is about whether the injunction should be limited to HART's current policy (HART's position) or should encompass any future policies prohibiting advertisements that "primarily promote a religious faith or religious organization" (Young Israel's position).

Given its ruling that the policy constituted impermissible viewpoint discrimination, we can see why the district court crafted the permanent injunction the way that it did. But our affirmance on *Mansky* reasonableness grounds—the district court's alternative and more narrow ruling—changes the calculus for the breadth of the injunction.

A permanent injunction "must be tailored to fit the nature and extent of the established [constitutional] violation." *Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984). In other words, the

injunction "must be no broader than necessary to remedy the constitutional violation." *Newman v. Ala.*, 683 F.2d 1312, 1319 (11th Cir. 1982). *See also* Richard H. Fallon, Jr., *Fact and Fiction About Facial Challenges*, 99 Cal. L. Rev. 915, 923 n.31 (2011) ("When a court pronounces a statute facially invalid, the force of its holding inheres entirely in the doctrines of claim preclusion, issue preclusion, and precedent as well as in the scope of any injunction that the court issues to enforce its judgment.").

We have declined to address whether HART's policy constitutes impermissible viewpoint discrimination, and have held only that the policy is unreasonable under *Mansky*. Our ruling "means that there is no circumstance in which *this particular* ban on [religious] advertising could ever be lawful," *White Coat*, 35 F.4th at 204, but it does not constitute a holding that any future variation of the policy—no matter how phrased and regardless of how words and terms might be defined and what guidance might be provided— would necessarily be unconstitutional. *See Ctr. for Investigative Reporting*, 975 F.3d at 317–18 (holding that certain provisions of a public transportation authority's advertising standards were unreasonable under *Mansky* and instructing the district court to issue an injunction "barring enforcement" of the challenged provisions of the "current" advertising standards).

Given our more narrow resolution of the case, the permanent injunction needs to be revised to apply only to HART's current policy. As we have done in similar cases, we will remand the case to the district court for that purpose. *See Barrett v. Walker Cnty.*

*Sch. Dist.*, 872 F.3d 1209, 1230 (11th Cir. 2017) ("The district court did not abuse its discretion in granting a permanent injunction. But because we affirm the district court's entry of summary judgment with respect to only the facial unbridled discretion claim, the district court must alter the scope of the injunction on remand so that the injunction remedies only the harm created by the unconstitutional grant of unbridled discretion that we have previously discussed."). *See also Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc) ("The record-keeping, inquiry, and anti-harassment provisions of FOPA violate the First Amendment, but the anti-discrimination provision, as construed, does not. The district court's judgment is affirmed in part and reversed in part, and the case is remanded so that the judgment and permanent injunction can be amended in accordance with this opinion.").

## V

We affirm the district court's order granting summary judgment in favor of Young Israel on the ground that HART's advertising policy was unreasonable under *Mansky*. We remand the case to the district court to limit the scope of its permanent injunction to HART's current policy.

**AFFIRMED AS TO THE GRANT OF SUMMARY JUDGMENT AND REMANDED FOR PURPOSES OF REVISING THE PERMANENT INJUNCTION.**

1                    Newsom, J., Concurring                    22-11787

NEWSOM, Circuit Judge, Concurring:

This is an easy case. Lurking just beneath the surface, though, is an almost unfathomable mystery that underlies—but if taken seriously, would seem to under*mine*—existing First Amendment doctrine as applied to regulations of "religious" speech: What, exactly, is religion?

**I**

First, though, the easy part: HART's policy, which prohibits advertisements that "primarily promote a religious faith or organization," violates the Free Speech Clause for at least two independent reasons. First, as the majority holds, the policy "fails to define" or provide any "official guidance" regarding key terms—most notably, "religious"—and thus "vests too much discretion in those charged with its application." Maj. Op. at 20. Accordingly, the policy violates the settled rule that speech restrictions—even those operative in non-public and limited public fora—must be "capable of reasoned application" and "guided by objective, workable standards." *Minnesota Voters All. v. Mansky*, 138 S. Ct. 1876, 1891–92 (2018).

Second, and separately, HART's policy is self-evidently—in fact, bunglingly—viewpoint-discriminatory. By its plain terms, the policy doesn't just prohibit speech "about" religion, it singles out speech that "promotes" religion. And to be clear, the lopsidedness of the policy's religious-speech restriction isn't just patent, it's conspicuous: Other provisions of HART's advertising policy, for exam-

2                  Newsom, J., Concurring                22-11787

ple, neutrally prohibit advertising *"containing* profane language, obscene materials or images of nudity,"* Hillsborough Transit Authority Policy Manual § 810.10(4)(b), Doc. 1-1 at 145 (emphasis added), or advertising that *"contain[s]* discriminatory materials and/or messages,"* *id.* § 810.10(4)(c) (emphasis added). Whatever the constitutionality of those provisions, a speech restriction that prohibits only the "promot[ion]" of a religious faith or organization constitutes viewpoint discrimination, plain and simple.

## II

Now for the hard part. Underlying both issues that I've flagged is a question that, I fear, neither policymakers nor judges are particularly well-equipped to answer: What is religion? Let me explain.

## A

Consider first what I'll call the *"Mansky* issue": As already explained, today's majority correctly holds that HART's policy violates the First Amendment because it fails to define or explain the phrase "religious faith or organization" or otherwise guide officials' discretion in applying it. *See* Maj. Op. at 18–24. And again, I agree. It seems to me, though, that an even more fundamental problem looms. I'm not sure that *any* religious-speech restriction could survive a reasonableness inquiry under *Mansky*—because I'm not sure that any policymaker could define or identify "religious" speech using "objective, workable standards." 138 S. Ct. at 1891.

The majority opinion says that the word "religious" has a "range of meanings." Maj. Op. at 20. That's true, but colossally

21-12106                    Newsom, J., Concurring                    3

understated.  Closer to the mark, I think, is the majority opinion's recognition that the term "religious" is "inherent[ly] ambigu[ous]." *Id*. at 21.  Pretty much any criterion one can imagine will exclude faith or thought systems that most have traditionally regarded as religious.  Consider, for instance, one definition of "religious" that the majority opinion posits: "'[h]aving or showing belief in and reverence for God or a deity.'"  *Id*. at 20–21 (quoting The American Heritage Dictionary of the English Language 1474 (4th ed. 2006)).  That, as I understand things, would eliminate many Buddhists and Jains, among others.  Or another: "'[b]elief in and reverence for a supernatural power or powers as creator and governor of the universe.'"  *Id*. at 21 (quoting the same source's definition of "religion").  Again, I could be wrong, but I think many Deists and Unitarian Universalists would resist that explanation.  And so it goes with other defining characteristics one might propose.  Belief in the afterlife?  I'm pretty sure that would knock out some Taoists, and presumably others, as well.  Existence of a sacred text?  My research suggests that at least in Japan, Shintoism has no official scripture.  Existence of an organized "church" with a hierarchical structure?  Neither Hindus nor many indigenous sects have one.  Adherence to ritual?  Quakers don't.  Existence of sacraments or creeds?  Many evangelical Christians resist them.  A focus on evangelization or proselytizing?  So far as I understand, Jews typically don't actively seek to convert non-believers.

Relatedly, what truly distinguishes "religious" speech from speech pertaining to other life-ordering perspectives?  Where does the "religious" leave off and, say, the philosophical pick up?  Is

4                    Newsom, J., Concurring                    22-11787

Randian Objectivism "religious"? *See* Albert Ellis, *Is Objectivism a Religion?* (1968). My gut says no, but why? How about "Social Justice Fundamentalism"? *See* Tim Urban, *What's Our Problem?: A Self-Help Book for Societies* (2023). Same instinct, same caveat. Scientology? TM? Humanism? Transhumanism? You get the picture.

Bottom line: No matter how hard they try—no matter how many definitions they supply, and no matter how much guidance they provide—I'm doubtful that policymakers can define "religious" speech in a sufficiently principled and comprehensive way to satisfy *Mansky*. "What is religion?" just isn't a question that they are particularly well-suited to answer.[1] *Cf. Kondrat'yev v. City of Pensacola*, 949 F.3d 1319, 1336 (11th Cir. 2020) (Newsom, J., concurring) ("[C]an it really be that I—as a judge trained in the law rather than, say, neurology, philosophy, or theology, am charged with distinguishing between 'psychological' injury, on the one hand, and 'metaphysical' and 'spiritual' injury, on the other?").

_____

[1] Notably, this is the very inquiry that free-exercise jurisprudence eschews. *See Watts v. Florida Int'l Univ.*, 495 F.3d 1289, 1296–97 (11th Cir. 2007) ("We need not delve far into philosophy, however, because the Supreme Court has at least twice instructed us not to engage in any 'objective' test of whether a particular belief is a religious one.") (citing *Thomas v. Review Bd. of the Ind. Emp. Sec. Div.*, 450 U.S. 707 (1981), and *United States v. Seeger*, 380 U.S. 163 (1965)); *see also Employment Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 887 (1990) (quoting *Hernandez v. C.I.R.*, 490 U.S. 680, 699 (1989) ("[I]t is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds.").

**B**

Separately, the parties here vigorously dispute whether transit advertising policies that (like HART's) restrict "religious" speech regulate on the basis of *content* or *viewpoint*. *See* Br. of Appellant at 29–31; Br. of Appellee at 23–27. And it's understandable why that's such a flashpoint: The categorization matters given the standards that apply to speech in the various First Amendment "fora." Reasonable content-based distinctions are permissible, for instance, in both limited public and non-public fora. *See Cornelius v. NAACP Legal Def. and Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) (non-public fora); *Keister v. Bell*, 29 F.4th 1239, 1252 (11th Cir. 2022) (limited public fora). But "'viewpoint discrimination' is forbidden" no matter the forum classification. *Matal v. Tam*, 582 U.S. 218, 243 (2017); *see also Cook v. Gwinnett Cnty. Sch. Dist.*, 414 F.3d 1313, 1321 (11th Cir. 2005) (observing that "even in a non-public forum," the law is "clearly established that the state cannot engage in viewpoint discrimination").

For its part, Young Israel insists that HART's policy constitutes impermissible viewpoint discrimination—and not just because (as already explained) it targets speech that "promotes" religion, but rather, and more broadly, because *any* restriction on religious speech is, ipso facto, viewpoint-discriminatory. *See* Br. of Appellee at 23 *et seq*. And under existing free-speech precedent, I think Young Israel may well be right about that. It points to what it calls a "trilogy" of Supreme Court decisions that invalidated educational institutions' policies that specifically forbade the use of school facilities or resources for "religious" purposes. *See Lamb's*

6                         Newsom, J., Concurring                   22-11787

*Chapel v. Center of Moriches Union Free Sch. Dist.*, 508 U.S. 384, 387 (1993); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 831–32 (1995); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 109, 120 (2001). Young Israel particularly emphasizes the following passage from the opinion in *Rosenberger*, zeroing in on the last sentence:

> It is, in a sense, something of an understatement to speak of religious thought and discussion as just a viewpoint, as distinct from a comprehensive body of thought. The nature of our origins and destiny and their dependence upon the existence of a divine being have been subjects of philosophic inquiry throughout human history. We conclude, nonetheless, that here . . . viewpoint discrimination is the proper way to interpret the University's objections to [a student-run religious magazine]. By the very terms of [its] prohibition, the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints. *Religion may be a vast area of inquiry, but it also provides . . . a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered.*

515 U.S. at 831 (emphasis added).

That passage, Young Israel says—and, again, especially the concluding sentence—indicates the Supreme Court's verdict that "religion" is a distinct viewpoint and, it follows, that any restriction

21-12106                 Newsom, J., Concurring                 7

on "religious" speech constitutes impermissible viewpoint discrimination.

I tend to think that Young Israel has correctly read *Rosenberger*, and the "trilogy" more generally. Although the *Rosenberger* Court nodded at the possibility that religion might be a general "subject matter," it certainly seemed to land on a narrower, more specific view. And *Good News Club*, decided several years later, likewise described religion as *"the viewpoint* from which ideas are conveyed." 533 U.S. at 112 n.4 (emphasis added). Notably, others have since interpreted the trilogy the same way, including in cases remarkably similar to this one. *See, e.g.*, *Northeastern Pennsylvania Freethought Soc'y v. County of Lackawanna Transit Sys.*, 938 F.3d 424, 437 (3d Cir. 2019) (invalidating a transit-system policy prohibiting "religious" ads and emphasizing that "[r]eligion is not only a subject" but "a worldview through which believers see countless issues").[2]

---

[2] In *Archdiocese of Wash. v. Washington Metro. Area Transit Auth.*, the D.C. Circuit read the trilogy differently and held that a similar restriction on "religious" ads regulated only content, not viewpoint. *See* 897 F.3d 314 (D.C. Cir. 2018). The Supreme Court's denial of certiorari drew a sharp dissent. *See Archdiocese of Wash. v. Washington Metro. Area Transit Auth.*, 140 S. Ct. 1198, 1199 (2020) (Gorsuch, J., dissenting from the denial of certiorari) ("[WMATA's religious speech ban] is viewpoint discrimination by a governmental entity and a violation of the First Amendment. In fact, this Court has already rejected no-religious-speech policies materially identical to WMATA's on no fewer than three occasions over the last three decades." (citing *Good News Club*, 533 U.S. at 98; *Rosenberger*, 515 U.S. at 819; *Lamb's Chapel*, 508 U.S. at 384)).

The upshot, it seems to me, is that the Supreme Court has effectively merged content and viewpoint—at least for purposes of religious speech. Religion, the Court appears to have said, is *both* (and simultaneously) a general, content-based category *and* a more particular viewpoint. And the result of that move, I think, is to render any formulation of a religious-speech restriction—whether blanket or promotion-only—an exercise in unlawful viewpoint discrimination.

I understand the impulse—the "distinction" between content and viewpoint, after all, "is not a precise one." *Rosenberger*, 515 U.S. at 831. I'm skeptical, though, for two reasons. For starters, it's inconsistent with how the Supreme Court has treated other forms of core First Amendment expression. Most notably, perhaps, the Court has assiduously enforced the content-viewpoint distinction with respect to political speech, despite the fact that it "occupies the highest, most protected position" in the First Amendment hierarchy. *R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., concurring); *see also, e.g.*, *Meyer v. Grant*, 486 U.S. 414, 420, 426 (1988) (observing that "[c]ore political speech" is where "First Amendment protection is 'at its zenith'"). The Court has held, for instance, that laws regulating political content are permissible in non-public fora, while those regulating on the basis of political viewpoint aren't. *See, e.g.*, *Mansky*, 138 S. Ct. at 1885–86; *Greer v. Spock*, 424 U.S. 828, 831, 837–39 (1976). In fact—and somewhat closer to home—the Court has specifically held that local transit

21-12106                Newsom, J., Concurring                9

authorities can prohibit general "paid political advertising" in public streetcars without violating the Free Speech Clause. *See Lehman v. City of Shaker Heights*, 418 U.S. 298, 299, 304 (1974) (plurality).

More fundamentally, I'll confess that I'm just not sure that it's accurate to characterize religion as "a specific premise, a perspective, a standpoint." *Rosenberger*, 515 U.S. at 831. Perhaps it's just that I'm not sure what that means. Is the suggestion that there is a single all-encompassing religious "premise, perspective, [or] standpoint"? Or is "religion," in the way the Supreme Court is using the term, a general umbrella-like descriptor that houses multiple sect-specific viewpoints? Or maybe the Court means to say that a "religious" viewpoint can just be defined on a case-by-case basis in contrast to some "secular" comparator? Any of these, I think, is a fair reading of *Rosenberger*, but all, I fear, entail complications.

The religion-as-a-single-overarching-viewpoint reading may be intuitive—we figure we know a "religious" viewpoint when we see one—but I think it masks important nuance and complexity. Can we really say, for instance, that there's a single "religious" perspective about anything? The death penalty? Climate change? The good life more generally? I'm doubtful.

What about the notion that "religion" is a category that comprises various "religious" viewpoints? Maybe, but doesn't that just land us right back where we started? What qualifies a particular viewpoint as sufficiently "religious" that it's entitled to protection as "religious speech" under the trilogy—supreme beings, afterlives, creeds, catechisms, etc.? *See supra* at 2–3. And relatedly—

I mean in a metaphysically inextricable sense—what is it about, say, "philosophical" speech that disqualifies it from "religious" status and the accompanying protection?

There's one more possibility, I suppose:  Maybe the Supreme Court means that "religious" viewpoints can be identified on an ad hoc basis vis-à-vis some "secular" comparator.  So, for instance, in *Lamb's Chapel*, the Court held that a school district had impermissibly discriminated on the basis of viewpoint when it opened its premises for all "social, civic, or recreational purposes" but refused to allow their use to screen a film that addressed "family issues and child rearing" from a "religious perspective."  508 U.S. at 391–94.  At first blush, that seems pretty straightforward.  But I wonder whether it's too easy—and maybe even tautological?  Does the mere existence of a non-religious or irreligious alternative automatically transform any regulation of religious content into a restriction of the "religious" viewpoint?  If so, why doesn't the same logic hold in the political-speech context?  Imagine a "content"-based ban on political advertising on city buses—which, again, would be permissible under existing doctrine.  *See Lehman*, 418 U.S. at 304.  Couldn't an advocacy group simply repackage its challenge, complaining that the prohibition discriminates on the basis of viewpoint because it permits ads about, say, gas prices from commercial perspectives but not political ones?

However you slice it, I'm just not sure the religion-as-ipso-facto-viewpoint approach holds up very well.  I fear that it may cause more confusion than it's worth.

★  ★  ★

One last thing:  Wouldn't cases like this be better handled under the Free Exercise Clause?  At the very least, the analysis seems pretty free-exercise-y to me.  Justice Scalia made a similar point in his concurring opinion in *Good News Club*.  There, in the course of agreeing with the Court's free-speech-based disposition, he said that he didn't "suppose it matter[ed]" whether the restriction at issue was "characterized as viewpoint or subject-matter discrimination."  *Good News Club*, 533 U.S. at 122 (Scalia, J., concurring).  The reason, he explained—conspicuously citing free-*exercise* precedents—is that "excluding the Club's speech . . . 'because it's religious' will not do."  *Id*. (citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532–33, 546 (1993); *Employment Div., Dep't of Hum. Res. of Ore. v. Smith,* 494 U.S. 872, 877–78 (1990)).  I suspect that under modern free-exercise doctrine, litigants like Young Israel will rack up the wins.  But, if free-exercise logic is "doing the work," we might be better off just deciding the cases on those grounds.

### III

I'm not sure there's an easy answer to any of this.  In fact, I'm pretty sure there isn't.  The difficulty, I think, is inherent in the nature of religion—and particularly in using "religion," or "religious"-ness, as a constitutional measuring stick.  We use those terms daily, and I think it's probably fair to say that we have a rough-and-ready sense of what they entail.  But as is so often the case, the devil (or in this case the deity) is in the details.  And the deeper one

probes, the harder it becomes to settle on a precise, necessary-and-sufficient definition of "religion," and thus of "religious" speech. Truth is, there is no one defining characteristic of "religion"; there are arguably—and a thoroughly argued—many. Accordingly, the lines separating "religious" from philosophical and even political traditions (and expression) are hazy at best. At the end of the day, I fear that the terms "religion" and "religious" are exactly as the majority describes them, "inherent[ly] ambigu[ous]," Maj. Op. at 21, and thus particularly precarious foundations on which to build free-speech doctrine.

GRIMBERG, District Judge, Concurring:

I join Parts I, II, III.B, and III.C of the Court's opinion. I write separately because I would have gone farther. In my view, our analysis should not have stopped at the obvious *Mansky* violation if HART's policy is incapable of ever being applied constitutionally. It cannot be. The policy's inability to be applied reasonably should not inoculate it from its more severe and incurable constitutional flaw. By constructing a policy that is so clearly and completely incapable of reasonable application, HART has successfully evaded a ruling on the viewpoint-versus-subject-matter dispute that is at the heart of this case. And that evaded ruling, in my view, has long been settled by the Supreme Court's "trilogy" of cases: *Lamb's Chapel v. Center of Moriches Union Free School District,* 508 U.S. 384, 387 (1993), *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 831–32 (1995), and *Good News Club v. Milford Central School,* 533 U.S. 98, 109, 120 (2001). Even if HART drafted a policy in theoretically perfect compliance with *Mansky* (although I share Judge Newsom's skepticism that this is even possible), I believe the trilogy is fatal to HART's religious ad prohibition.

A review of the trilogy cases is in order. In *Lamb's Chapel*, a school district allowed use of facilities for "social, civic, or recreational" purposes, but not "religious purposes." On that basis, it denied the use of its facilities to a church that wanted to show a film series on family values and childrearing. The government argued that the school's ban was a permissible subject matter exclusion ra-

ther than a denial based on viewpoint. The Supreme Court disagreed. According to the Court, the subjects—family values and childrearing—were permissible, and the school therefore engaged in viewpoint discrimination by excluding the church from addressing the topics from its Christian viewpoint.

Next came *Rosenberger*. There, the University of Virginia subsidized the costs of some student publications but declined to fund those that "primarily promot[ed] or manifest[ed] a particular belie[f] in or about a deity or an ultimate reality." The Supreme Court held that this constituted viewpoint discrimination since it precluded a religious perspective, or viewpoint, as to subjects that could otherwise be discussed and considered from a secular perspective. The Court noted that "religion may be a vast area of inquiry, but it also provides…a specific premise, a perspective, a standpoint from which a variety of subjects may be discussed and considered." *Id*. at 831.

Finally, in *Good News Club*, a local Christian organization applied for use of a school cafeteria, a space open for community use, to hold the group's weekly afterschool meetings. But, the school's community use policy, which foreclosed use "by any individual or organization for religious purposes," barred the group's request. The Supreme Court held that this constituted impermissible viewpoint discrimination. The unconstitutional nature of the policy was rooted in its acceptance of groups that would promote the moral and character development of children, but its exclusion of

21-12106                Grimberg, J., Concurring                3

the Club's activities—which also promoted the moral and character development of children—because they were religious in nature. The Court held that "speech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint." 533 U.S. at 112.

The trilogy cases have been applied to public transportation systems at least twice—with opposing results. In *Archdiocese of Wash. v. Wash. Metro. Area Transit Auth.*, 897 F.3d 314 (D.C. Cir. 2018), the public transportation system (WMATA) rejected a proposed advertisement from the Catholic Church bearing the silhouette of three shepherds and sheep, along with the words "Find the Perfect Gift" and a church website URL, based on a policy prohibiting religious advertisements. The D.C. Circuit determined that the policy, materially identical to the policy before us today, did not constitute unconstitutional viewpoint discrimination but rather an appropriate subject matter prohibition. The Supreme Court denied certiorari.[1] Justice Gorsuch, however, dissented from the denial of cert, noting that in his view this case was wrongly decided under the trilogy. While that statement of course bears no precedential value, the logic is sound and deftly articulates my position in this case. As Justice Gorsuch pointed out, "[n]o one dispute[d] that, if Macy's had sought to place the same advertisement with its own website address, [WMATA] would have accepted the business

---

[1] The full Court could not hear the case because then-Circuit Court Judge Kavanaugh participated in the appellate decision.

4                    Grimberg, J., Concurring                    22-11787

gladly. Indeed, WMATA admit[ted] that it views Christmas as having 'a secular half' and 'a religious half,' and it has shown no hesitation in taking secular Christmas advertisements." *Archdiocese of Washington v. Washington Metro. Area Transit Auth.*, 140 S. Ct. 1198, 1199 (2020). Where the *same advertisement*, with the same *content* is welcomed when references to religion are removed and replaced with secular ones, I see no way around concluding, based on the trilogy, that the public transportation system engaged in unconstitutional viewpoint discrimination.[2]

That is precisely what happened in this case. When presented with Young Israel's ad, HART suggested that it would run the advertisement if Young Israel removed references in the ad to Judaism—the menorah and the word Chanukah, for example. HART essentially asked Young Israel to remove the religious angle of the ad, but not otherwise change the content. What's more, HART previously had accepted ads for secular holiday events that involved ice skating and seasonal décor. I read the trilogy of cases as concluding that this is precisely what HART cannot do—permit advertising on "a *subject* sure to inspire religious views"—holiday events—"and then suppress those views" while allowing a secular analogue. *Archdiocese of Washington*, 140 S. Ct. at 1200.

---

[2] The other post-trilogy public transportation case is *Ne. Pa. Freethought Soc'y v. Cnty. of Lackawanna Transit Sys.*, 938 F.3d 424, 432–37 (3d Cir. 2019), where the Third Circuit determined that the Lackawanna Transit System violated the First Amendment when it enacted a policy with prohibitions on religious messages, finding that the policy and its application constituted religious viewpoint discrimination.

The majority opinion rightly notes that our circuit's holding in *Cambridge Christian School, Inc. v. Florida High School. Athletic Ass'n*, 942 F.3d 1215 (11th Cir. 2019), must be considered in any viewpoint discrimination analysis. Maj. Op. at 17–18. In *Cambridge Christian*, a case decided on a motion to dismiss, the Florida High School Athletic Association (FHSAA) rejected two Catholic schools' requests to read a prayer on the loudspeaker before a football game. This Court determined that the FHSAA's restriction was content-based, not viewpoint-based, because the complaint was clear "that the FHSAA relied on the nature of the proposed message as a prayer when it decided not to grant the schools' request…. The complaint [did] not allege, for instance, that Christian prayer was prohibited but that Jewish or Muslim prayer would have been allowed, which would present an obvious case of viewpoint discrimination." *Id.* at 1242. The Court explicitly did not rule out the possibility of discovery revealing that the prayer prohibition was discriminatory of a viewpoint if, for example, "a secular act of solemnization or invocation of some sort would have been permitted by the state at the outset of the game." *Id.* at n.8. In other words, if the content of the prayer could otherwise have been invoked for a secular purpose, the schools would have a "strong" case that the prohibition constituted viewpoint discrimination.

For this reason, I believe *Cambridge Christian* offers little guidance for our purposes. We have far more facts presented here, at the summary judgment stage, than the *Cambridge Christian* Court had before it when ruling on the motion to dismiss. In fact, we have precisely the facts that the *Cambridge Christian* Court indicated

would make a strong case for viewpoint discrimination— specifically, a secular comparator. The facts and procedural posture of our case cleave far closer to those in the trilogy cases. I see no material difference between the facts in the trilogy cases and the facts here. HART's policy constitutes unconstitutional viewpoint discrimination, and there is no change in the way its policy is administered and applied that can fix this fundamental constitutional flaw.

Of course, my position provides no solution to the legitimate concerns posed in Judge Newsom's concurrence about the inherent difficulty of drawing a religious-based viewpoint/subject matter distinction in the first instance. I share his skepticism that there can ever be a coherent categorical determination that religious speech is *ipso facto* an expression of one's viewpoint rather than a subject matter. Even with respect to my position, I acknowledge that the logical distinction is not precise—it matters greatly how we define the scope of a policy and prohibition. For example, in *Lamb's Chapel*, the Court determined the subject matter to be "family issues/childrearing" and the viewpoint to be religious. However, it could just as easily have determined that the subject matter was "religious films" and gone the other way. Here, HART's position that the subject matter of Young Israel's advertisement was "Chanukah on Ice" is a reasonable one. The subject matter/viewpoint distinction can arguably be drawn in favor of either party.

That said, the Supreme Court has drawn this line so that it favors Young Israel in this case. Putting aside broader concerns

21-12106                  Grimberg, J., Concurring                        7

about the nature of religion, to decide this case we must work with and within current Free Speech doctrine and I believe the trilogy answers the viewpoint/subject matter dispute here loudly and clearly. So much so that I would have reached that question in the majority opinion, as the district court did. Otherwise, and as it currently stands, HART can continue drafting viewpoint discriminatory policies while also failing to reasonably apply them—perpetually evading review of the ultimate constitutional flaw.